

1997 Decisions

5-8-1997

# Mitchell v. Eastman Kodak Co

Precedential or Non-Precedential:

Docket 96-7034

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Mitchell v. Eastman Kodak Co" (1997). *1997 Decisions.* Paper 99.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/99

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 8, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 96-7034

GEORGE W. MITCHELL

v.

EASTMAN KODAK COMPANY
Appellant

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Civil Action No. 93-cv-00840)

Argued: October 24, 1996

Before: STAPLETON and NYGAARD, Circuit Judges,
MAZZONE,* District Judge

(Opinion Filed May 8, 1997)

Thomas E. Wood (Argued)
Keefer, Wood, Allen & Rahal
210 Walnut Street
P.O. Box 11963
Harrisburg, PA 17108-1963
Attorney for Appellant

_____

* Hon. A. David Mazzone, United States District Judge for the District
of Massachusetts, sitting by designation.

Timothy J. O'Connell (Argued)
Turner & O'Connell
258 North Street
P.O. Box 1123
Harrisburg, PA 17108

**OPINION OF THE COURT**

STAPLETON, Circuit Judge:

In this case, we are asked to decide whether the denial of
a claim for benefits under a Long-Term Disability Plan
governed by the Employee Retirement Income Security Act
("ERISA"), 29 U.S.C. §§ 1001 et seq., by a Plan participant
suffering from Chronic Fatigue Syndrome ("CFS") was
arbitrary and capricious. We hold that, in the
circumstances present here, it was. We will therefore affirm
the district court's grant of summary judgment in favor of
the Plan participant.

I. Facts

George Mitchell ("Mitchell"), then an employee of
Eastman Kodak Company ("Kodak"), first began suffering
from persistent coughs, sore throats, fever, and extreme
fatigue in the fall of 1988. He consulted a family physician
and an infectious disease specialist, but neither could find
any medical explanation for his persistent fatigue and other
symptoms. On January 30, 1989, Dr. Gerald Gordon of the
Geisinger Medical Center diagnosed Mitchell with "chronic
fatiguing illness," not explained by any "clear infectious
cause." The intermittent flu-like symptoms and chronic
overwhelming fatigue persisted.

As a result of his chronic fatigue, Mitchell stopped
working in January 1989. He received short-term disability
benefits from Kodak until June 26, 1989, when his
eligibility for short-term benefits expired. Mitchell then
applied for long-term disability benefits under Kodak's
Long-Term Disability Plan (the "Plan"), an "employee welfare
benefit plan" governed by ERISA. According to the terms of
the Plan, a participant is eligible to receive long-term

2

disability ("LTD") benefits if he, <u>inter alia</u>, suffers from a disability that renders him "totally and continuously unable to engage in any substantial Gainful Work[1] for which he is, or becomes, reasonably qualified by education, training, or experience." Plan § 2.06, App. at 12.[2]

Metropolitan Life Insurance ("MLI"), the claims administrator under the Plan, reviewed Mitchell's medical records and denied his claim for LTD benefits in September 1989. Mitchell sought reconsideration, and MLI affirmed the denial of benefits. In accordance with the terms of the Plan, Mitchell appealed MLI's decision to the Plan Administrator at Kodak. After reviewing Mitchell's claim file, the Administrator affirmed the denial of benefits on the ground that Mitchell had failed to provide "objective medical evidence that [his] condition made [him] totally and continuously unable to engage in <u>any</u> substantial gainful work for which [he was] qualified as of June 26, 1989." Letter of January 17, 1992, App. at 24.

Mitchell then brought this ERISA action to challenge the Administrator's decision under 29 U.S.C. § 1132(a)(1)(B), which allows an ERISA plan participant to bring a civil action to recover benefits due him under the terms of the plan. Mitchell alleged that he suffered from a disability as defined in the Plan as of June 26, 1989, and thus was and is entitled to LTD benefits under the Plan.

Mitchell and Kodak filed cross-motions for summary judgment. Although both parties had assumed that the district court would review the Administrator's denial of Mitchell's claim under an "arbitrary and capricious" standard, the court instead conducted a <u>de novo</u> review

---

1. "Gainful Work is paid employment." Plan § 2.11, App. at 13.

2. The Plan also requires that a participant seeking LTD benefits (1) have one year of continuous or adjusted service before the last day worked before the onset of disability; (2) have not reached normal retirement date; (3) have a disability that did not result from an act of war or participation in an insurrection, rebellion, or riot; (4) apply for Primary Social Security Disability Insurance Benefits; and (5) remain under the care of a licensed physician. Plan § 4.01, App. at 16-17. There is no dispute that Mitchell met all of these requirements when he applied for benefits.

3

because the copy of the Plan submitted by the parties[3] contained no language granting the Administrator discretion to determine a Plan participant's eligibility for benefits. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989); Luby v. Teamsters Health, Welfare and Pension Trust Funds, 944 F.2d 1176 (3d Cir. 1991). The court found that the evidence clearly showed that Mitchell was suffering from CFS in June 1989, but was insufficient to demonstrate that his CFS rendered Mitchell totally unable to engage in any substantial gainful work at that time. The court also concluded, however, that there was insufficient evidence to find that Mitchell was not totally disabled by his CFS. To resolve the issue, the court remanded the matter to the Administrator for reconsideration after supplementation of the record with additional information on Mitchell's ability to engage in gainful work on June 26, 1989.

On remand, Mitchell submitted to the Administrator a letter from his physician, Dr. Nelson Gantz, dated August 18, 1994, which explained how Mitchell's persistent CFS symptoms rendered him unable to engage in any substantial gainful work. After reviewing this supplemental information "and again reviewing the entirety of the claims administrator's file," the Administrator reaffirmed his denial of Mitchell's claim for LTD benefits. Letter of Apr. 12, 1995, App. at 192-93. The Administrator insisted that Dr. Gantz's letter, which was written in the present tense, "failed to shed any new light on Mr. Mitchell's condition as of June 26, 1989." Id. at 193. The Administrator concluded, once again, that Mitchell "ha[d] failed to provide any objective medical evidence that his condition made him totally and continuously unable to engage in any substantial gainful work for which he was qualified as of June 26, 1989." Id.

Mitchell then filed with the district court a Petition to Re-Open Motion for Summary Judgment. Kodak, in opposition

_____

3. Mitchell attached a copy of the Plan dated January 1, 1990 to his Complaint filed May 7, 1993. In its Answer, Kodak "admit[ted] that the copy attached to the complaint is a true and correct copy of the Plan." Defendant's Answer ¶ 4, App. at 25-26. In fact, the Plan had been amended effective April 14, 1991.

4

to the Petition, submitted 1991 Plan Amendments that granted the Administrator "discretionary authority to determine all questions arising in the administration, interpretation and application of the plan" and argued that the Amendments, which had been in effect when the Administrator finally denied Mitchell's claim in January 1992, precluded the district court from reviewing the Administrator's decision de novo. The district court, although recognizing that the Plan Amendments indeed granted the Administrator discretionary authority to administer the Plan, again conducted a de novo review. The court interpreted this court's decision in Luby v. Teamsters Health, Welfare and Pension Trust Funds, 944 F.2d 1176 (3d Cir. 1991), to require de novo review of all fact-based decisions by ERISA plan administrators. Dec. 14, 1995 Op. at 9-11. Pursuant to its de novo review, the court granted summary judgment for Mitchell on the ground that the undisputed evidence demonstrated that Mitchell suffered from CFS that rendered him totally unable to engage in any substantial gainful work as of June 26, 1989 and that he was therefore entitled to LTD benefits under the Plan. Kodak appeals the grant of summary judgment, challenging both the district court's de novo review of the Administrator's decision and its conclusion that Mitchell was totally disabled as of June 26, 1989.

The district court had jurisdiction over this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. We have jurisdiction over the appeal from the district court's grant of summary judgment pursuant to 28 U.S.C. § 1291. Our review of the district court's grant of summary judgment is plenary, and we apply the same test that the district court should have applied in the first instance. Bixler v. Central Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1297 (3d Cir. 1993).

II. Discussion

Kodak challenges the district court's de novo review of the Plan Administrator's decision and argues that the court should have affirmed the Administrator's decision under the "arbitrary and capricious" standard. Alternatively, Kodak asserts that even under de novo review, the district

5

court should have affirmed the Administrator's decision. Mitchell, on the other hand, argues that de novo review was appropriate, and, alternatively, that even under the "arbitrary and capricious" standard of review he is entitled to summary judgment. We agree with Kodak that the "arbitrary and capricious" standard is applicable here, but we also find that the Administrator's decision should be overturned even under that deferential standard.

A. Standard of Review

ERISA does not set out the standard of review for an action brought under § 1132(a)(1)(B) by a participant alleging that he has been denied benefits to which he is entitled under a covered plan. However, in Firestone Tire & Rubber Co. v. Bruch, the Supreme Court addressed the question of the appropriate standard for actions challenging "denials of benefits based on plan interpretations." 489 U.S. 101, 108 (1989). The Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 115. Where the plan affords the administrator discretionary authority, the administrator's interpretation of the plan "will not be disturbed if reasonable." Id. at 111.4

_____

4. The Court also noted that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a `facto[r] in determining whether there is an abuse of discretion.' " Id. (quoting Restatement (Second) of Trusts § 187, Comment d (1959)). No conflict of interest is present here. Although the Plan is self-insured, the Plan assets are administered by a trustee pursuant to a trust agreement that provides that funds "may not be used for any purpose other than for the exclusive benefit of persons entitled to benefits under the Plan and for reasonable expenses of administering the Plan." Plan § 8.01. Therefore, because Kodak "incurs no direct expense as a result of the allowance of benefits, nor does it benefit directly from the denial or discontinuation of benefits," Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 45 n.5 (3d Cir. 1993), there is no conflict of interest sufficient to justify heightened review of the Administrator's decision.

6

In Luby v. Teamsters Health, Welfare, and Pension Trust Funds, we held that Firestone's de novo standard of review applies to decisions based on plan administrators' factual determinations as well as decisions based on their interpretations of the terms of the plan. 944 F.2d 1176, 1183-84 (3d Cir. 1991). We agreed with the Seventh Circuit that "the Court [in Firestone] intended de novo review where administrators were not granted discretion, regardless of whether the denials under review were based on plan interpretations." Id. at 1183 (quoting Petrilli v. Drechsel, 910 F.2d 1441, 1446 (7th Cir. 1990)). We were

not convinced by the rationale of ... courts [of appeals] holding that administrator's [sic] factual determinations should be subject to deferential review. Plan administrators are not governmental agencies who are frequently granted deferential review because of their acknowledged expertise. Administrators may be laypersons appointed under the plan, sometimes without any legal, accounting, or other training preparing them for their responsible positions, often without any experience in or understanding of the complex problems arising under ERISA, and ... little knowledge of the rules of evidence or legal procedures to assist them in factfinding.

Id. Thus, we concluded that, like plan administrators' decisions based on plan interpretations, "[an] ERISA plan administrator's fact-based determinations are to be reviewed de novo unless the plan specifically provides that his determinations of fact be given deference or grants the administrator the authority to make determinations between death benefit claimants." Id. at 1187.

The district court mistakenly relied on Luby to hold that, although the Kodak Plan "plainly vests discretionary authority in the plan administrator," Dec. 14, 1995 Op. at 8, de novo review of the denial of Mitchell's claim was appropriate because the denial was "based solely on [a] factual determination[ ]" of whether Mitchell was totally disabled at the time he applied for LTD benefits. Id. at 9. As we have explained, Luby did not hold that district courts must exercise de novo review over all factual determinations by ERISA plan administrators. Rather, it

7

held that <u>de novo</u> review of factual determinations, like plan interpretations, is appropriate <u>if the plan does not grant the plan administrator discretion to make those determinations</u>. Thus, the appropriate standard of review here depends on "whether the terms of this Plan grant the Administrator discretion to act as a finder of facts" to decide whether Mitchell was "totally disabled" by CFS on June 26, 1989, the date as of which he applied for LTD benefits. <u>See Luby</u>, 944 F.2d at 1180.

Section 8.03 of the Plan provides:

In reviewing the claim of any participant, the Plan Administrator shall have full discretionary authority to determine all questions arising in the administration, interpretation and application of the plan. In all such cases, the Plan Administrator's decision shall be final and binding upon all parties.

Giving this language its ordinary meaning, we conclude that the broad grant of discretionary authority to the Administrator is sufficient to preclude <u>de novo</u> review of both interpretative and factual determinations made in the course of applying the benefit provisions of the Plan to a particular application for benefits. Because fact-based determinations of eligibility for LTD benefits are certainly one of the "questions arising in the administration, interpretation and application of the plan," and the Administrator's decisions regarding such questions are "final and binding," the Plan clearly provides that eligibility determinations are to be afforded deference.[5]

_____

5. Our conclusion is consistent with our circuit jurisprudence. <u>See</u>, <u>e.g.</u>, <u>Nazay v. Miller</u>, 949 F.2d 1323 (3d Cir. 1991) (applying arbitrary and capricious standard to plan administrator's fact-based decision not to waive penalty provision where plan provided administrator with "discretion and authority to interpret and construe the provisions of the Plan, to determine eligibility to participate in the Plan, ... and to decide such questions as may arise in connection with the operation of the Plan"); <u>Stoetzner v. United States Steel Corp.</u>, 897 F.2d 115 (3d Cir. 1990) (applying arbitrary and capricious standard to administrator's denial of pension and severance benefits on basis of factual determination that claimants were afforded comparable pension benefits after sale of plan sponsor where plan provided that "[the administrator] shall ... decide all

8

Mitchell argues that the Administrator's authority to determine questions arising in the "application" of the Plan does not entitle his decisions to deference because it "is no more than a vesting of authority to interpret the provisions of the plan." Mitchell Br. at 5. We find this argument untenable. First, § 8.03 specifically provides the Administrator with the power of "interpretation," and if the term "application" merely afforded that same power it would be entirely superfluous. Second, we think that "application" of the Plan, like judicial "application" of the law, must encompass the resolution of factual disputes as well as the interpretation of the governing provisions of the Plan. Thus, we conclude that the Plan Administrator's decision to deny Mitchell LTD benefits should be reviewed under an arbitrary and capricious standard.

B. Denial of Benefits

Under the arbitrary and capricious standard, "the district court may overturn a decision of the Plan administrator only if it is `without reason, unsupported by the evidence or erroneous as a matter of law.' " Abnathya v. Hoffman LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993) (quoting Adamo v. Anchor Hocking Corp., 720 F. Supp. 491, 500 (W.D. Pa. 1989)). "This scope of review is narrow, and`the court is not free to substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits.' " Abnathya, 2 F.3d at 45 (quoting Lucash v. Strick Corp., 602 F. Supp. 430, 434 (E.D. Pa. 1984)).

---

questions arising out of and relating to the administration of [the plan].... The decisions of the [administrator] shall be final and conclusive as to all questions of interpretation and application of [the plan] and to all other matters arising in the administration thereof."); Scarinci v. Ciccia, 880 F. Supp. 359 (E.D. Pa. 1995) (applying arbitrary and capricious standard to administrator's mixed fact- and plan-interpretation-based decision to deny short-term disability benefits under plan that required employee to provide "satisfactory" evidence of disability to administrator with discretionary authority "to ... determine conclusively for all parties all questions arising in the administration of the Plan").

9

1. <u>The Plan</u>

In determining whether the Plan Administrator's decision to deny Mitchell LTD benefits was arbitrary and capricious, we begin with the Plan itself, since an ERISA plan administrator must "discharge his duties with respect to a plan ... in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." 29 U.S.C. § 1104(a)(1)(D). Section 4.01 of the Plan provides that in order to qualify for LTD benefits, a participant must, <u>inter alia</u>, "[m]eet the definition of Disability in Section 2.06."6 Section 2.06 in turn provides:

"Disability" for the purpose of this Plan is a condition fulfilling these requirements:

a) A Participant is totally and continuously unable to engage in any substantial Gainful Work for which he is, or becomes, reasonably qualified by education, training, or experience, and

b) The disability:

1) has lasted for a continuous period of 26 weeks inclusive of time during which Short-Term Disability benefits and Workers Compensation Income Replacement benefits were paid (except where a Participant is involuntarily terminated from the Employer as a result of a layoff, a divestiture, or a special separation plan), or

2) has lasted for less than 26 weeks, but can reasonably be expected to last for a total of at least 26 weeks, or

3) is expected to result in death.

LTD benefits under the Plan are not automatic, and a claimant bears the burden of demonstrating that he qualifies for benefits. <u>See</u> Plan §§ 4.01 and 4.02; Kodak Employee Handbook, App. at 112. Thus, the Plan required that Mitchell, in order to obtain LTD benefits, show that as

_____

6. The other eligibility requirements are described <u>supra</u>, note 2. Mitchell's satisfaction of those requirements is not in dispute.

10

of June 26, 1989, he was totally and continuously unable to engage in any substantial gainful work for which he was reasonably qualified.

## 2. Mitchell's Record Support

To determine whether Mitchell has carried his burden, we look to the record as a whole. Cf. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981) (noting that court reviewing denial of Social Security disability benefits "retain[s] a responsibility to scrutinize the entire record and to reverse or remand if the ... decision is not supported by substantial evidence"). Under the arbitrary and capricious standard of review, the "whole" record consists of that evidence that was before the administrator when he made the decision being reviewed. See Luby, 944 F.2d at 1184 n.8; Woolsey v. Marion Laboratories, Inc., 934 F.2d 1452, 1460 (10th Cir. 1991); Voliva v. Seafarers Pension Plan, 858 F.2d 195, 196 (4th Cir. 1988). Here, because the Administrator made two decisions--the January 17, 1992 denial that precipitated this lawsuit and the April 12, 1995 re-affirmation of that denial that preceded the district court's grant of summary judgment and this appeal--there is some dispute regarding what constitutes the "whole" record.

The January 17, 1992, letter communicating the Administrator's initial decision to deny LTD benefits advised Mitchell that if he had additional "objective medical evidence that [he] was disabled within the meaning of [the Plan] as of June 26, 1989," he should submit it and the Administrator would "reopen [his] file." App. at 24. Consistent with that position, Kodak does not ask us to review and overturn the district court's order directing reconsideration by the Administrator after an opportunity to supplement the record. Nevertheless, Kodak asks us to review the district court's subsequent judgment of December 14, 1995, directing payment of benefits, on the basis of the record as it existed before supplementation. We decline to do so. In the absence of a successful attack on the order requiring reconsideration, our only appropriate course is to review the district court's December 14, 1995, judgment based on the legally relevant record then before it. Given our conclusion that the district court should have

11

asked only whether the Administrator's denial was arbitrary and capricious, on the basis of the record before the Administrator, this means that the relevant record on appeal is the evidence before the Administrator at the time of his final denial on April 12, 1995.

The undisputed evidence in his claim file as of April 12, 1995, shows that as of June 26, 1989, Mitchell's chronic and unpredictable fatigue and loss of concentration made it impossible for him to sustain regular paid employment. Mitchell's medical records indicate that he began complaining of fatigue, fever, a persistent cough, and other flu-like symptoms in the fall of 1988. An infectious disease specialist diagnosed Mitchell with "chronic fatiguing illness" in January 1989, and Physician's Statements submitted in support of Mitchell's claim in June 1989, May 1990, and July 1990 all indicated that Mitchell suffered from chronic fatigue. Although the doctors who completed the two earlier Statements expressed uncertainty regarding whether Mitchell's fatigue rendered him "totally disabled," the third clearly stated that Mitchell was "totally disabled" from gainful employment because of his CFS.[7] In 1991, the Social Security Administration agreed with that conclusion, awarding Mitchell Social Security Disability benefits after comprehensively reviewing his medical history and concluding that "[t]he medical evidence establishes that the claimant has severe chronic fatigue syndrome with Epstein-Barr Virus" and that he "lacks the residual functional

_____

7. Kodak contends that the July 1990 Physician's Statement is unreliable because it is internally inconsistent, indicating that Mitchell suffered only "No Limitation" or "Some Limitation" in performing activities such as sitting, standing, pushing, pulling, and spoken and written communication, but that he was nonetheless totally disabled from any occupation. We do not find this "inconsistency" dispositive. It seems to us to be attributable largely to the inappropriateness of the Physician's Statement form for evaluating disability resulting from CFS. CFS does not disable an individual afflicted with it from performing particular, isolated activities, but rather prevents him from performing all activities for any prolonged period of time. Thus, it is not inconsistent, given the characteristics of CFS, for Mitchell's doctor to conclude that Mitchell was totally unable to engage in substantial gainful activity, even though his ability to perform isolated activities such as standing, pushing, pulling, and communicating was only "somewhat" limited.

12

capacity to perform the physical exertion and nonexertional requirements of work." App. at 136.

By 1993, Mitchell was under the care of Dr. Nelson Gantz, a doctor familiar with CFS. On September 21, 1993, Dr. Gantz wrote a letter to the Plan Administrator diagnosing Mitchell's CFS and describing his symptoms:

In my opinion [ ]his illness had an acute onset and my impression is that Mr. Mitchell has chronic fatigue syndrome.

The treatment for chronic fatigue syndrome is symptomatic and the prognosis is unknown. Based on these last two items and his symptomatology it would make him physically incapable of increased or sustained activities. He cannot keep a regular schedule because of his constant fatigue and his loss of concentration.

Based on Mr. Mitchell's history, it is my opinion his acute onset developed in October 1988. Since chronic fatigue syndrome is a disease of exclusion, Mr. Mitchell has been extensively worked up in the past and in this office ....

App. at 165-66.

On August 18, 1994, Dr. Gantz wrote another letter that clarified how Mitchell's symptoms of "fatigue, fevers, joint pain, muscle pain, sore throats, markedly decreased concentration, headaches, muscle weakness and occasional sleep problems" disabled him from all substantial gainful activity:

The frequency and severity of symptoms in patients with the Chronic Fatigue Syndrome vary greatly and can wax and wane. There is no pattern to the cycle, and unfortunately it is difficult to say when he will have good days or bad days.... At present, restricting activities is the only way to prevent exacerbation of his CFS symptoms. He is capable of only mild, intermittent activities. His ability to sustain any activity, even for a few hours, is unpredictable.... I feel that Mr. Mitchell is 100% disabled at this time and work for him is out of the question.

13

Letter of Aug. 18, 1994, App. at 191. Dr. Gantz's letters, taken together with the earlier records of Mitchell's persistent CFS symptoms, support the proposition that Mitchell began suffering acute CFS symptoms in the fall of 1988, and that his symptoms rendered--and continue to render--him incapable of sustaining prolonged activities, including any gainful employment. There is no evidence to the contrary.

Kodak argues that because Mitchell's records contain no explicit doctor's statement that "Mitchell was totally disabled as of June 26, 1989," they fail to establish that Mitchell was in fact "totally disabled" by CFS on June 26, 1989. Although it is true that the records lack such an explicit statement, we conclude that that alone does not support the Administrator's conclusion that Mitchell failed to show total disability as of June 26, 1989. The undisputed reports from Mitchell's treating physicians show that he began suffering CFS symptoms well before June 1989, and Dr. Gantz's letter of August 18, 1994 clearly explains how those symptoms rendered Mitchell totally disabled from gainful work.

Moreover, Mitchell's treating physicians' early difficulty diagnosing Mitchell's CFS and understanding how it disabled him from work do not support the Administrator's conclusion. Mitchell's CFS symptoms have remained consistent since before June 1989 and later, undisputed evidence from a doctor more knowledgeable about the diagnosis and symptomatology of CFS clearly supports Mitchell's contention that CFS has rendered him totally unable to engage in any substantial gainful work since January 1989. As the Tenth Circuit explained in Sisco v. United States Dep't of Health & Human Services, in which the patient's CFS had gone undiagnosed from 1983 to 1989,

[u]nder the facts of this case, the early examinations cannot be considered as contradicting or rebutting [Plaintiff 's] recent diagnosis.... [C]hronic fatigue syndrome was not even recognized as a disease until 1988, and the first technique to diagnose it was not published until that same year.... It is highly unlikely that any of the physicians who examined Plaintiff prior

14

to the Mayo Clinic [which diagnosed her] would have considered or even been aware of chronic fatigue syndrome. The government has not cited to a single physician who examined Plaintiff <u>after</u> the Mayo Clinic or in light of the medical community's new understanding of chronic fatigue syndrome who contradicted or in any way questioned the conclusions of the Mayo Clinic and her treating physician.

Moreover, because chronic fatigue syndrome is diagnosed partially through a process of elimination, an extended medical history of "nothing-wrong" diagnoses is not unusual for a patient who is ultimately found to be suffering from the disease. The Mayo Clinic and her treating physician considered Plaintiff's entire medical history--including all the failed attempts to diagnose--in making their assessments. Finally, in a purely linguistic sense, an early report that "I am unable to find the cause" does not contradict a later report that "I have now found the cause." The statements together demonstrate an evolution rather than a contradiction.

10 F.3d 739, 745 (10th Cir. 1993).

Here, the doctors who examined Mitchell between 1988 and 1990 were apparently unfamiliar with CFS, <u>see</u>, <u>e.g.</u>, Physician's Progress Notes of June 6, 1989, App. at 60 ("[Mitchell] brought in some literature from CBC [sic; CDC (Centers for Disease Control)?] on a chronic fatigue syndrome. He may well have this, but I don't know how to prove it."), and thus were unable to declare with confidence that he was totally disabled by the disease. However, Dr. Gantz's letters of September 1993 and August 1994 dispel the confusion evidenced in the earlier medical records, and make clear that Mitchell's CFS, though misunderstood, clearly disabled him from all substantial gainful work as of June 26, 1989.

3. <u>The Administrator's Decision</u>

According to the record before us, the Administrator denied Mitchell's claim for LTD benefits because Mitchell had failed to tender "objective medical evidence" that he

15

was unable to engage in any substantial gainful work as of June 26, 1989.[8] We hold that, in this context, it was arbitrary and capricious for the Administrator to deny Mitchell LTD benefits for this reason.

The Administrator's denial letters are terse, and we are not altogether certain of their meaning. However, we find the denial arbitrary and capricious under either of the possible meanings we can divine. The Administrator may have meant that Mitchell had tendered insufficient evidence to persuade the Administrator that Mitchell experienced chronic and unpredictable fatigue and loss of concentration or that he experienced those symptoms to a sufficient extent to foreclose his holding down paid employment. If that was the Administrator's meaning, his denial of benefits on that ground was arbitrary and capricious because the undisputed facts of record are to the contrary. As we have already described, the undisputed evidence from Mitchell's physicians indicates that Mitchell has suffered severe CFS symptoms that have precluded him from engaging in any substantial gainful work since January 1989. Kodak has identified no more "objective" evidence that Mitchell could have submitted, in addition to his doctors' observations, to support his claim that his fatigue and loss of concentration were sufficiently severe to prevent him from engaging in gainful work.

Because the Administrator cited a lack of "objective medical evidence," as opposed to merely "objective evidence," we think it more likely that the Administrator meant that Mitchell had failed to submit clinical evidence establishing the etiology of the chronic and unpredictable fatigue and loss of concentration that disabled him from

---

8. See Letter of Jan. 17, 1992, App. at 24 ("The file indicates that you are suffering from fatigue, but does not contain objective medical evidence that your condition made you totally and continuously unable to engage in any substantial gainful work for which you were qualified as of June 26, 1989.") (emphasis in original); Letter of Apr. 12, 1995, App. at 193 (informing Mitchell's attorney that denial of benefits was affirmed because "you and your client have failed to provide any objective medical evidence that his condition made him totally and continuously unable to engage in any substantial gainful activity for which he was qualified as of June 26, 1989.") (emphasis in original).

16

working. Although in some contexts it may not be arbitrary and capricious to require clinical evidence of the etiology of allegedly disabling symptoms in order to verify that there is no malingering, we conclude that it was arbitrary and capricious to require such evidence in the context of this Plan and CFS.

The Plan requires that a claimant for LTD benefits "[m]eet the definition of Disability," i.e. be "totally and continuously unable to engage in any substantial Gainful Work for which he is, or becomes, reasonably qualified" for at least 26 weeks. See Plan §§ 2.06, 4.01. Nowhere does the Plan state that a claimant must provide clinical evidence of the etiology of the "condition" that renders him disabled. Cf. Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 520 (3d Cir. 1997) (administrator's discretionary interpretation of plan "may not controvert the plain language of the [plan] document") (citing Gaines v. Amalgamated Ins. Fund, 753 F.2d 288, 289 (3d Cir. 1985)). All that the Plan required was that Mitchell show that he was in fact "disabled" as of June 26, 1989, and this he did. See supra Part II-B-2.

Moreover, it was impermissible for the Administrator to imply an additional "clinical evidence of etiology" requirement not specified in the Plan document in the context of CFS. It is now widely-recognized in the medical and legal communities that "there is no `dipstick' laboratory test for chronic fatigue syndrome." Sisco v. United States Dep't of Health & Human Services, 10 F.3d 739, 744 (10th Cir. 1993). Because the disease, although universally-recognized as a severe disability, has no known etiology, see, e.g., Rose v. Shalala, 34 F.3d 13, 16-17 (1st Cir. 1994), it would defeat the legitimate expectations of participants in the Kodak Plan to require those with CFS to make a showing of clinical evidence of such etiology as a condition of eligibility for LTD benefits. Thus, it was arbitrary and capricious for the Administrator to deny Mitchell benefits because of a lack of such clinical evidence of the etiology of his CFS.

III. Conclusion

In accordance with the foregoing, we hold that the Kodak Plan Administrator's decision to deny Mitchell's claim for

17

LTD benefits was "arbitrary and capricious." We will affirm the district court's grant of summary judgment for Mitchell.

A True Copy:
Teste:

<u>Clerk of the United States Court of Appeals</u>
<u>for the Third Circuit</u>

18