Tanya M. OSLOWSKI, Plaintiff,

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA, Defendant.**

**No. CIV. A. 99–356.**

United States District Court, W.D. Pennsylvania.

April 12, 2001.

John F. Becker, Sikov & Love, Pittsburgh, PA, for plaintiff.

Terrence H. Murphy, William M. Hassan, Klett, Lieber, Rooney & Schorling, Pittsburgh, PA, for defendant.

## Memorandum Opinion

COHILL, Senior District Judge.

Tanya M. Oslowski filed this action in the Court of Common Pleas of Allegheny County against the Life Insurance Company of North America ("LINA"), the insurer that carried her employer's group disability insurance policy, seeking the long term disability benefits which the defendant had denied. LINA removed the case to this court, since Oslowski was seeking benefits due under a plan covered by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, 1132(a)(1)(B). Presently before us is plaintiff's motion for summary judgment (Doc. 22) and accompanying brief. Defendant has filed a brief in opposition (Doc. 33), which requests that we deny plaintiff's motion and grant summary judgment in its favor. For the reasons set forth below, we will grant summary judgment in this matter in favor of the defendant and against the plaintiff.

## Background

Plaintiff Tanya M. Oslowski was employed as a claims specialist by State Farm Mutual Automobile Insurance Company ("State Farm"). In October of 1995, she began treatment for depression. At first, she received short term disability paid by her employer. After six months, an Application for Long Term Disability Insurance was sent to defendant LINA, which carried State Farm's long term disability insurance policy. Pl.'s Ex. C (plaintiff's claims file) at 357. This insurance was an employee benefit, and Oslowski paid for it through payroll deduction.

The summary plan description ("SPD") of the applicable policy, Long Term Disability Income Policy LK–6900 ("Disability Income Plan" or "the Plan"), shows that State Farm appointed the Life Insurance Company of North America to administer

the long term disability plan. Pl.'s Ex. B. Plan documents granted LINA the power "to make all reasonable rules and regulations required in the administration of the Plan and for the conduct of its affairs, to make all determinations that the Plan requires for its administration, and to construe and interpret the Plan." Pl.'s Ex. B at 5280. Furthermore, LINA processed all claims, notified claimants if any additional information, such as a medical examination was required, and either paid or denied the claim. Pl.'s Ex. B at 5310.

The Disability Income Plan provided for a disabled employee to receive an amount equal to 65% of her wages, less any other applicable benefits. Pl.'s Ex. C at 333. In order for the Plan Administrator to find a covered employee "not disabled," and thereby to deny benefits, it had to determine that she was capable of being employed at a job which would pay her 80% of the wages she was earning at the time of her disability.

When Oslowski filed her claim for benefits, LINA requested information from her treating physicians, Donald J. Wilfong, M.D., who had apparently treated the plaintiff for sinus problems, James Garver, M.D., her gynecologist, and John Delaney, M.D. who treated her for depression. Pl.'s Ex. C at 273–82.

Dr. Delaney stated that he had begun treating the plaintiff for depression on October 24, 1995. Her appointments were scheduled weekly until January of 1996, when they were reduced to every two weeks. Dr. Delaney prescribed Paxil, an anti-depressant medication. Dr. Delaney went on to describe Oslowski's condition:

I have not seen the need to provide psychological testing to this patient because the diagnosis was relatively clear. I feel she is really unable to do any type of job at this point. She suffers from a rather fragile ego and is barely able to maintain the activities of her home with her children and this requires the help of her husband as well. Prior to this depression she was able to function quite well without any real difficulty maintaining herself both at home and at the job. At this time I really feel that she is totally disabled. I feel that she is unable to do anything except those things which she can do as far as taking care of the children. I feel, at this point, her prognosis is guarded in view of her depression being so long lasting. Pl.'s Ex. C at 273–74.

After reviewing the records in plaintiff's claims file, LINA approved her claim for Long Term Disability Benefits on June 12, 1996. Pl.'s Ex. C at 333–34. The approval letter informed her that to qualify for benefits during the first 24 months, she must be unable to perform the essential duties of her occupation. However, to continue to qualify for benefits after the first two years, she must be unable to engage in the essential duties of any occupation. LINA stated that it would be requesting periodic updates on the status of her disability, and that it could have an examination performed by a physician of the insurer's choice. *Id.* at 334.

Oslowski's request for Social Security Disability Benefits was denied on July 16, 1996. Pl.'s Ex. C at 283–85.

At the defendant's request, Oslowski was examined by Lawrence Lobl, M.D. Dr. Lobl filed a psychiatric evaluation and report on October 31, 1996, and a separate report on November 19, 1996. Pl.'s Ex. C at 238–248; 228–229. Dr. Lobl agreed with Dr. Delaney's diagnosis that Oslowski had suffered a major depression in 1995, and stated that the depression was in partial remission. He disagreed with Dr. Delaney's conclusion that the plaintiff was totally disabled. Dr. Lobl reported that:

It does seem clear that Ms. Oslowski did suffer a Major Depression in the spring

and fall of 1995. Although there may have been biochemical aspects to this, family history seems largely negative and patient was, indeed, under multiple stresses. She found family life was stressful, her marriage unhappy and work increasingly stressful. She was having fantasies of fleeing. She reacted at first with symptoms of anxiety and then major depression following an angry confrontation at work.

In my view, it is the combination of stressors that precipitated the depression. Her work situation, although apparently difficult, does not, as she describes it, seem beyond the usual stresses of a difficult workplace.

Treatment has been with psychoactive medications and psychotherapy on an intermittent basis with some, but not total improvement. In her current situation, Ms. Oslowski seems more angry, withdrawn and apathetic than depressed. Her functional capacities appear to be good although she is fragile and, I feel, would have difficulty returning to work in her old position, although her current functional capacities are good. I do not feel, however, that she is totally disabled from a psychiatric point of view and I feel that planning for return to some kind of work should be started.

Pl.'s Ex. C at 243–44.

Dr. Lobl added: "I do not feel that the patient, at this time, is totally disabled, and I do feel that it may be in her best interest to begin planning to return her to work, as long as there is some intervention to ease the social situation which impedes her return." Pl.'s Ex. C at 245.

In response to a subsequent query from the insurer, as to whether Oslowski could return to the same job with another employer, Dr. Lobl stated:

If the stresses that this woman is dealing with in her family could be ade-quately taken care of, I do believe that Ms. Oslowski could return to the same job with another employer, since, in my opinion, she does not appear to be so impaired at this time as to make duties of her job impossible.

As I indicated in my letter, however, the overall situation remains extremely difficult and unless there is relief of her social situation, I do believe that there would be some deepening of her depression, should she return prematurely to work.

Pl.'s Ex. C at 228.

After the first 24 months of disability payments, the Policy defined "Total Disability" as "an inability to perform all the essential duties of any occupation for which you are or may reasonably become qualified based on education, training or experience." Pl.'s Ex. C at 194, Letter of 10/17/97 from Monte R. Denman, Benefit Analyst, to Oslowski. Denman stated that they were reevaluating the plaintiff's claim to determine her continuing eligibility for benefits, and enclosed a disability questionnaire for Oslowski to complete. Pl.'s Ex. C at 203. When asked "what prevents you from engaging in *ANY* gainful employment," Oslowski replied that "I still get panic attacks though not everyday like befor (sic) I do not like being around people and I can't deall (sic) with stress." Pl.'s Ex. C at 203.

As part of the reevaluation process, Oslowski was interviewed by Gisele Weisman, Ph.D. Dr. Weisman's report assessed Oslowski's motivation to remain on disability:

According to Tanya, not working allows her to be with her children. She stated that she refuses to put her kids back in daycare again, and that this is the best her life has ever been. In these regards, there is no motivation to return to work. However, there is reported pressure and resentment by her hus-

band regarding his feeling that she should be working. This is causing reported marital tensions and fighting. Pl.'s Ex. C at 191.

LINA contacted Dr. Delaney for further information on Oslowski's condition and treatment on October 17, 1997, and again in January of 1998. Pl.'s Ex. C at 195, 185–86. Dr. Delaney responded to these requests by letter dated January 16, 1998. He indicated that Oslowski had suffered from a major depression which was in partial remission; that he had seen her once a month during the previous year; and that she was doing well on the medication Paxil. He addressed his patient's prognosis as follows:

> When the patient stays on the 40mgs of *Paxil* she is able to function relatively well. I believe that her chronic dysthymia will require medication for most of her adult life. I will continue to see her about every 2 months for medication management and that there are no specific physical limitations in this patient evaluation, but she continues to be problematic from a psychologic standpoint.

Pl.'s Ex. C at 200.

LINA medical consultant Diana Morgan, RN, attempted to clarify the above information with Dr. Delaney, and, when her attempts were unsuccessful, recommended that the insurer implement peer to peer review. Pl.'s Ex. C at 201. According to a letter from Linda Galloway to the plaintiff, LINA had its medical consultant, Dr. Gary Lepkof, contact Dr. Delaney. Plaintiff's physician reportedly told Dr. Lepkof that there was nothing preventing Oslowski from interacting with others in a non-threatening environment. Pl.'s Ex. C at 141.

In March of 1998, LINA arranged for an outside vocational skills consultant, Lynn Lonberg of Regain Disability Management Services ("Regain"), to perform a transferable skills analysis. This assessed Oslowski's vocational potential, and was used to assist LINA in determining whether the plaintiff could perform a gainful occupation on a full-time basis. Pl.'s Ex. C at 164–72. Citing information provided by Dr. Delaney, Lonberg noted that Oslowski remained under certain medical restrictions: her depression was in partial resolution, she was doing well on 40 mg of Paxil, she had no specific restrictions at work, and she could not function well in a threatening environment. Pl.'s Ex. C at 166. Lonberg also considered that Oslowski had almost eight years of experience with State Farm Insurance, and that she was a high school and college graduate with a B.A. in Education.

In accordance with the Policy, potential jobs had to meet a wage requirement of $3200.82 per month, which was 80% of the plaintiff's pre-disability wage. Lonberg identified several potential occupations which met Oslowski's criteria: claim examiner, claims auditor, and credit analyst.

By letter dated April 8, 1998, LINA notified Oslowski that her Disability Income Plan benefits would be terminated. Pl.'s Ex. C at 159–60. The letter referenced Dr. Delaney's letter of January 16, 1998, which indicated that Oslowski could function relatively well provided she continued to take her medication and that she could return to work in a non-threatening environment. *Id.*

Oslowski appealed this decision on April 16, 1998. She also asked Dr. Delaney to clarify whether or not she could return to work, and, if so, to what type of employment. Pl.'s Ex. C at 174. He replied by letter to case manager Monte Denman, dated April 30, 1998, as follows:

> As you know she has been a former claims specialist, but I felt that it would be to stressful for her to return in view of her depression and chronic dysthymia, but I feel that she could do some

activities that would be in a non-threatening environment and most especially she could work in a half-time basis for the very start. I don't believe that she could return as a claims specialist given her difficulties in interacting with people and her rather fragile depression.

Pl.'s Ex. C at 145.

LINA denied Oslowski's appeal and confirmed the denial of further benefits on May 7, 1998. The insurer's decision cited Dr. Delaney's conclusions, including his letter of April 30, 1998, along with the results of the transferrable skills analysis. Pl.'s Ex. C at 141–42.

Oslowski again appealed, and LINA solicited additional information from her treating physician. Dr. Delaney stated that the plaintiff "could interact with people in a non-threatening environment and for the most part could do well and there may be times when the added stress may make her not function appropriately." Pl.'s Ex. C at 114.

LINA again reviewed Oslowski's claim, and confirmed its decision to deny benefits beyond April 8, 1998. Pl.'s Ex. 107–08. This appeal followed.

## Summary Judgment Standard

Summary judgment is proper where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Childers v. Joseph,* 842 F.2d 689 (3d Cir.1988). "Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "genuine issue" is one in which the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it might affect the outcome of the suit under the applicable rule of law. *Id.* A court considering summary judgment must examine the entire record in the light most favorable to the nonmoving party, and draw all reasonable inferences in its favor. *Id.*

## Standard of Review of a Denial of Benefits Claim

A reviewing court ordinarily applies a *de novo* standard of review to a plan administrator's denial of ERISA benefits. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Abnathya v. Hoffmann–LaRoche, Inc.,* 2 F.3d 40, 44–45 (3d Cir.1993). However, where the plan grants the administrator discretionary authority to construe the terms of the plan, or to determine eligibility for benefits, the court may reverse a denial of benefits only if the administrator's decision was "arbitrary and capricious." *Firestone,* 489 U.S. at 115, 109 S.Ct. 948; *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of America,* 222 F.3d 123, 128–29 (3d Cir.2000).

In some benefit plans, an insurance company is the plan administrator. Circumstances where an insurance company both determines eligibility for benefits and pays those benefits out of its own funds may present a conflict of interest, and that conflict should be considered when applying the arbitrary and capricious standard. *Firestone,* 489 U.S. at 115, 109 S.Ct. 948.

When the parties submitted their pleadings in this case, the standard which we must employ when considering the denial of a claim for ERISA benefits in such cases was unsettled in this jurisdiction. Since that time, however, the Court of Appeals for the Third Circuit has attempted to clarify how a conflict must be consid-

675

ered within the rubric of the arbitrary and capricious standard.[1] In *Pinto v. Reliance Std. Life Ins. Co.*, 214 F.3d 377 (3d Cir. 2000), the Third Circuit held that heightened scrutiny is required when an insurance company is both plan administrator and funder. *Id.* at 387. After a detailed analysis of the rationale used by other circuits, the court of appeals adopted a sliding scale approach to heightened review under the arbitrary and capricious standard. *Id.* at 390–91. A sliding scale is also used in the Fourth, Fifth, Sixth, Eighth, and Tenth Circuits. The Third Circuit explained this approach:

We think the best way to "consider these *potentially* relevant factors . . . is to use them to heighten our degree of scrutiny, without actually shifting the burden away from the plaintiff".

\* \* \* \* \* \*

[w]e can find no better method to reconcile *Firestone's* dual commands than to apply the arbitrary and capricious standard, and integrate conflicts as factors in applying that standard, approximately calibrating the intensity of our review to the intensity of the conflict.

\* \* \* \* \* \*

In sum, we adopt the sliding scale approach, and, accordingly, will expect district courts to consider the nature and degree of apparent conflicts with a view to shaping their arbitrary and capricious review of the benefits determinations of discretionary decisionmakers.

*Pinto*, 214 F.3d at 392–93.

The *Pinto* court then looked at a number of factors, and concluded that the administrator's decision should be examined "with a high degree of skepticism." *Id.* at 394. The court considered it significant that the insurer had reversed its own initial determination that the insured was

totally disabled and entitled to benefits; that the insurer had treated the same facts inconsistently; that one staff worker had recommended that benefits be reinstated; and, that faced with conflicting medical testimony, the insurer credited its own doctors' opinions instead of those of the plaintiff's own physician. *Id.* The case was remanded so that the district court could evaluate the evidence under the newly articulated heightened standard.

■ The sliding scale approach requires that each case be examined on its facts. *Id.* at 392. When applying the heightened arbitrary and capricious standard, "we are deferential, but not absolutely deferential." *Id.* at 393. Furthermore, the greater the evidence of conflict on the part of the administrator, the less deferential our review must be. *Id.*, (citing *Vega v. Nat'l Life Ins. Serv., Inc.*, 188 F.3d 287, 297 (5th Cir.1999)). Thus, "[w]e look not only at the result—whether it is supported by reason—but at the process by which the result was achieved." *Pinto*, 214 F.3d at 393.

■ Judicial review of an administrator's decision under the arbitrary and capricious standard is limited to "that evidence that was before the administrator when [it] made the decision being reviewed." *O'Sullivan v. Metropolitan Life Ins. Co.*, 114 F.Supp.2d 303, 309 (D.N.J. 2000) (quoting *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir.1997)). *Pinto* did not address whether the evidence changes when the standard is heightened arbitrary and capricious review. The *O'Sullivan* court, however, rejected the argument that the record should be broadened, and we have found no decisions widening the scope of the record on heightened arbitrary and capri-

1. Since the parties addressed a heightened review under the arbitrary and capricious standard in their submissions, we have not ordered additional briefs on the issue.

cious review. *O'Sullivan,* 114 F.Supp.2d at 309–10. The exception to this general rule is "evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice relating to a claim." *Id.,* (*quoting Vega,* 188 F.3d at 299). Therefore, in addressing the issue before us, we will consider the record used by the administrator in making its decision that the plaintiff was ineligible for benefits.

### Analysis

#### i.

■ In addition to the allegations in Count II, which are made under ERISA, the complaint states claims of breach of contract for failure to pay insurance benefits (Count I); bad faith under the Pennsylvania Unfair Insurance Practices Act, 40 Pa.S.A. § 1171 *et seq.* (Count III); and seeks a declaratory judgment that the defendant is responsible for the continued payment of plaintiff's disability benefits (Count IV). The defendant argues that these state law claims are preempted by ERISA and therefore must be dismissed. We agree.

Section 502(a)(1)(B), the civil enforcement provision of the ERISA statute, completely preempts all state law claims to recover benefits due, or to clarify the rights to future benefits under the terms of an ERISA plan. 29 U.S.C. §§ 1001, *et seq., 1132(a)(1)(B); Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 66, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). Since the claims raised under Counts I, III, and IV are, in essence, claims to recover benefits due under Oslowski's ERISA plan, they are preempted by the statute, and will be dismissed.

#### ii.

■ Since the Plan administrator in this case, LINA, has the discretion to make eligibility decisions, our starting position is the arbitrary and capricious standard of

review. However, this is also a case where an insurance company, acting as the Plan administrator, determines whether a claimant is eligible for benefits and also pays those benefits it concludes are due. Therefore, under *Pinto,* we must apply a heightened arbitrary and capricious standard to an administrator's decision to deny benefits. *Pinto* directs us to evaluate the factual and procedural background of the decision-making process used to deny the plaintiff's claim, in order to determine, on a sliding scale, how much deference should be accorded to the administrator's decision.

We see no indication, here, of the sort of procedural irregularities that plagued the court in *Pinto.* This is not a case where a benefits decision has been reversed midstream; the Policy provides for benefits for the first 24 months as long as the claimant is unable to perform her former job, and Oslowski received those benefits. Awards are automatically reviewed after 24 months, and the standard for continuing to receive long term benefits then changes to whether the claimant is unable to perform *any* occupation, consistent with health and salary restrictions. There is nothing in the record before us to suggest that LINA's usual procedures were not followed in the case, and there are no conflicting or inconsistent interpretations of the factual information that would cause us to view the administrator's decision with extreme scrutiny.

Factually, as well, we see little evidence of the sort of bias the *Pinto* court warns us against. When Oslowski first applied for long term disability benefits, her physician, Dr. Delaney, stated that she was unable to work and that she was totally disabled. Pl.'s Ex. C at 273–74. Plaintiff was granted benefits on the basis of this opinion. The insurer's physician, Dr. Lobl, subsequently examined the plaintiff.

He agreed that Oslowski had suffered a major depression, but disagreed with Dr. Delaney in concluding that she was *not* totally disabled and should begin planning to return to some kind of work. Pl.'s Ex. C at 243–44. Although these opinions are inconsistent, they do not raise our suspicions that the insurer merely credited the opinion of its own physician to avoid funding Oslowski's disability benefits, because LINA continued to fund the full 24 month period of benefits until its own procedures required the application of a different standard. The record shows that Dr. Delaney's opinion of the plaintiff's medical condition had changed since he first diagnosed and began treating her depression; by 1998, he planned to continue to see her every two months for medication management, and stated that Oslowski had no specific physical limitations but remained problematic from a psychologic standpoint. Pl.'s Ex. C at 200. Although Dr. Delaney did not feel she could return to work as a claims specialist, he believed the plaintiff could return to work in a non-threatening environment. Pl.'s Ex. C at 145.

It does not appear to us that the apparent conflict which must be presumed from the insurance company's dual role as plan administrator and funder had much, if any, influence on LINA's decision not to extend Oslowski's long-term benefits after the first 24 months had run. Accordingly, on the sliding scale required by *Pinto*, we find that the administrator's decision to deny plaintiff's long-term disability benefits is due a moderate degree of deference. With this heightened standard in mind, we now turn to the question of whether the administrator's decision was arbitrary and capricious.

### iii

■ Plaintiff first argues that the administrator's decision was arbitrary and capricious because another individual, John R. Hillman, Jr., who was employed by another insurance company which was a subsidiary of CIGNA, LINA's parent company, looked at Oslowski's medical records and concluded that she was ineligible for a life insurance policy. This argument is without merit, since the determination of ineligibility in question was not part of the evidence that was before the administrator when it made the decision being reviewed. Our review here is limited to the question of whether LINA's decision to terminate Oslowski's long term disability benefits was arbitrary and capricious under a heightened standard, and we may consider only the evidence that was before the insurance company when it made this decision. *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir.1997). We decline plaintiff's invitation to make John Hillman's deposition part of the record in this case.

■ The plaintiff further contends that LINA's decision was arbitrary and capricious because "[t]here is no medical report in the Defendant's file which says the Claimant is capable of working at the jobs the Defendant says the Plaintiff can perform." Pl.'s Br. at 9–10. Oslowski cites no authority to support her position that a physician must approve a specific job before benefits may be denied. Furthermore, our reading of the administrative record shows that both Dr. Delaney and Dr. Lobl were of the opinion that Oslowski could return to work, as long as she was not put in a threatening environment. Dr. Delaney did disagree with the vocational consultant regarding the plaintiff's ability to return to her job as a claims specialist, and stated that he did not think she could return to that position. Pl.'s Ex. C at 145. However, the vocational consultant identified two other positions that met plaintiff's requirements, and there is no indication that she cannot perform these other jobs.

The Policy provided for a continuation of benefits past 24 months only if Oslowski

was unable "to perform all the essential duties of any occupation" for which she was or could reasonably become qualified, "based on education, training or experience." Pl.'s Ex. C at 194. We reject plaintiff's argument that the record does not support the administrator's decision, and, given the substantial evidence in the record, we cannot say that the decision to terminate benefits was arbitrary and capricious.

Oslowski also asserts that we should not give any weight to the medical opinion of Dr. Lepkof, who conducted a peer-to-peer discussion with Dr. Delaney about the plaintiff's condition, because Dr. Lepkof never examined the plaintiff and because his representation of what Dr. Delaney told him is inadmissible hearsay.

The record shows that LINA medical consultant Diana Morgan, RN, was unable to communicate successfully with Dr. Delaney regarding a clarification of his letter dated January 16, 1998. Pl.'s Ex. C at 201. Morgan suggested that the insurer have Dr. Lepkof contact Dr. Delaney in a medical consultant referral, to obtain the necessary information. *Id.* Their actual telephone conversation is not part of the record in this case. What the record does show is that LINA did not rely on Dr. Lepkof's rendition of Dr. Delaney's comments in the letter it sent to Oslowski denying the continuation of benefits. Pl.'s Ex. C at 159–60. That letter cites Dr. Delaney's own comments, made in the letter of January 16. *Id.*

The May 7, 1998, letter from LINA, which confirmed the earlier denial of plaintiff's benefits, does refer to Dr. Delaney's purported comments: "In a telephone conversation with our Medical Consultant on February 14, 1998, Dr. Delaney reported he believes you are ready to attempt a return to work and that nothing prevents you from interacting with other people in a non-threatening environment." Pl.'s Ex. C at 141. However, the record shows that Dr. Delaney himself made essentially this same representation when he stated that Oslowski was able to return to work in a non-threatening environment. Pl.'s Ex. C at 114, 145. Plaintiff's argument regarding Dr. Lepkof's conversation with Dr. Delaney simply does not establish that LINA's decision was arbitrary and capricious.

iv.

We conclude that even giving only moderate deference to the administrator's determination not to extend benefits, that decision was not arbitrary and capricious. There was more than enough evidence in Oslowski's record to support the conclusion that she could perform some job, at the appropriate wage-level, as long as it would be in a non-threatening environment. As we have stated, although Dr. Delaney's initial conclusion that Oslowski was completely disabled conflicted with Dr. Lobl's report that she was not totally disabled from a psychiatric point of view, LINA approved 24 months of long-term disability benefits on the basis of Dr. Delaney's report. Indeed, Dr. Lobl's report was never given as the basis for the insurer's decision to deny benefits.

LINA contacted plaintiff's treating physician several times during the reevaluation of her benefits as the 24 month period neared its end, and the record shows that the care he thought she required had been dramatically reduced during those two years. In January 1996, Dr. Delaney was scheduling appointments with Oslowski every two weeks; by January of 1998, he reported that he had seen the patient once a month during the past year, and expected to continue seeing her once every two months in the future for medication management. Pl.'s Ex. C at 200. He stated that she needed to remain on medication, but found that "there are no specific physi-

cal limitations" to her ability to work, although "she continues to be problematic from a psychologic standpoint." *Id.* In the letter he wrote after Oslowski first appealed the denial of continued benefits, Dr. Delaney said that the plaintiff "could do some activities that would be in a non-threatening environment" but that he didn't believe that she could resume work as a claims specialist "given her difficulties interacting with people." Pl.'s Ex. C at 145. In his last report, a letter to Monte Denman dated June 18, 1998, Dr. Delaney reiterated her need for a non-threatening work environment.

Accordingly, we find that LINA's decision not to extend Oslowski's long term disability benefits after April 8, 1998 was not arbitrary and capricious and is supported by the record. Therefore, we will deny plaintiff's motion for summary judgment (Doc. 22) and will grant summary judgment in favor of the defendant. An appropriate Order follows.