**Cheryl DORSEY, Plaintiff,**

v.

**PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, Defendant.**

**No. CIV. A. 01–1072.**

United States District Court, E.D. Pennsylvania.

Oct. 5, 2001.

---

Jon C. Lyons, Lancaster, PA, for plaintiff.

Richard L. McMonigle, Jr., Post & Schell, P.C., Philadelphia, PA, Steven J. Schildt, McKissock and Hoffman, P.C., Philadelphia, PA, for defendant.

## MEMORANDUM AND ORDER

KATZ, Senior District Judge.

Now before the court are cross-motions for summary judgment in the above-captioned action filed under the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. § 1001 *et seq.* Because the court finds that the insurance company's decision to deny benefits was arbitrary and capricious, the plaintiff's motion for summary judgment is granted and the defendant's motion for summary judgment is denied.

### I. Background

Plaintiff Cheryl Dorsey brings this action against the defendant, Provident Life and Accident Insurance (Provident), following Provident's denial of her claim for long-term disability (LTD) benefits. The plaintiff applied for benefits on the grounds that she suffered from fibromyalgia, a disorder characterized by diffuse musculoskeletal pain, stiffness, paresthesia, nonrestorative sleep and easy fatigability. *Harrison's Principles of Internal Medicine* 1706–07 (Kurt J. Isselbacher, et al., eds., 13th ed.1994). Fibromyalgia is a rheumatological disorder that manifests itself through a variety of symptoms including,

> generalized aching and stiffness of the trunk, hip and shoulder girdles. Other patients complain of generalized aching and muscle weakness. Patients perceive that their joints are swollen; however, joint examination is normal.... Patients complain of exhaustion and wake up tired. They also awake frequently at night and have trouble falling back asleep. Symptoms are made worse by stress or anxiety, cold, damp weather, and overexertion.... Disorders commonly associated with fibromyalgia include irritable bowel syndrome, irritable bladder, headaches (including migraine headaches), and dysmeorrhea.

*Id.* at 1706. Fibromyalgia is diagnosed by its clinical manifestations, and, in particular, manifestation of tender sites which "are exquisitely more tender than adjacent areas." *Id.* Joint and muscle examination is normal and there are no laboratory abnormalities associated with the disorder. *Id.* While some patients respond well to treatment, "others continue to have chronic disease which may be only partially relieved, if at all." *Id.*

The history of plaintiff's claim for benefits is as follows.[1] Dorsey worked as Director of Sales and Marketing at Zurich Payroll Solutions until she became ill in February, 1999. App. to Def.'s Summ. J. Mot. at PLACL00004.[2] In August, 1999, she submitted an application for long term disability benefits to defendant Provident Life and Accident Insurance. App. at PLACL00001–55. Dorsey's application stated that she suffered from severe migraines and cervical strain, and her primary care physician indicated that she suffered from "severe fibromyalgia, severe migraines, [and] cervical strain." App. at PLACL00006. On August 24, 1999, case manager Karen Mathis, a registered nurse (RN), spoke with the plaintiff and the plaintiff's employer, as well as reviewed her medical records. App. at PLACL00060–61. In an internal memo,

---

1. All facts are taken from the ERISA Administrative Record submitted by the defendant. The administrative record is a complete and full copy of Ms. Dorsey's claims file. Decl. of Carolyn Little, Disability Claims Rep. for Def.

2. Hereinafter, the administrative record, filed with defendant's motion for summary judgment, will be cited as App. at PLACL# .

Mathis noted that an independent doctor had examined the plaintiff, that she was receiving short-term disability payments, and that her employer described her job as requiring some travel. *Id.* Mathis recommended gathering more medical information from Dorsey's primary care physician, rheumatologist, and physical therapist. *Id.*

On September 29, 1999, RN Julie Kennelly conducted a second review of Dorsey's claim. App. at PLACL00071–72. In her report, titled "DCM review," Nurse Kennelly discussed the medical records submitted by the plaintiff and noted that many doctors had diagnosed Dorsey with fibromyalgia. *Id.* Even though the doctors were unanimous in their diagnosis, the Kennelly concluded that there was not enough data to support their conclusions stating:

> [a]lthough several physicians give the insured the diagnosis of fibromyalgia none of them list all the trigger points or other findings of the syndrome. Depression is usually associated with this diagnosis, however, the insure [sic] denies any depression and no diagnosis of such is given. Due to lack of medical support the diagnosis does not appear conclusive.... Duration of disability cannot be made at this time, as there is not enough information to support insured's inability to perform her job without accommodations."

App. at PLACL00071–72. Kennelly then recommended that Provident obtain all the available medical records and review the claim again.

On October 8, 1999, Dr. David Chesner, Dorsey's rheumatologist, submitted a detailed letter to Provident on behalf of Dorsey. Dr. Chesner gave a thorough description of the plaintiff's medical condition and indicated that she was seeing a psychologist for the depression caused by her illness stating:

> [A m]usculoskeletal examination revealed severe fibromyalgia trigger points present diffusely throughout the axial and appendicular skeleton.... Cheryl Dorsey is completely and totally disabled from seeking gainful employment at this time. This is secondary to severe fibromyalgia syndrome with chronic fatigue and cognitive impairment. There is no cure for fibromyalgia, and therefore the therapies are somewhat limited. Her pain level has persisted despite numerous attempts with narcotic analgesics and antidepressants. Her prognosis for recovery is extremely poor.

App. at PLACL00465–67.

A physical therapist then examined the plaintiff at Provident's request and conducted a functional capacity evaluation (FCE) on November 18, 1999. App. at PLACL00215. According to the therapist, the plaintiff's performance during this evaluation placed her in the light category of work. However, the therapist noted that it was "questionable" whether the plaintiff gave her full effort throughout the entire test. App. at PLACL00210–15. Provident conducted video surveillance of the plaintiff for three full days beginning November 17th culminating in a fifteen minute videotape showing the plaintiff driving her children to school as well as walking slowly to and from her car for very brief periods of time.[3]

On January 10, 2000, Dr. Nancy Beecher, conducted Provident's only physician review of the plaintiff's disability claim. However, it is unclear whether Dr. Beecher reviewed all of the medical records or simply the FCE and surveillance tape,[4]

---

3. The videotape was submitted in support of the Def.'s Summ. J. Mot.

4. The referral to Dr. Beecher only requested that she review the FCE and the surveillance tape. App. at PLACL00216.

and her report only referenced those two sources. App. at PLACL00216–17. Dr. Beecher's report concluded that the plaintiff was capable of performing light physical demand work, App. at PLACL00216 – 17, and noted that Dorsey was "said to have given less than [a] full effort [on] the evaluation based on grip testing." App. at PLACL00217.

In addition, Pam Perdue, Provident's Rehabilitation Consultant, performed an analysis of the FCE and the plaintiff's job requirements on January 18, 2000. Perdue employed a generic description of Dorsey's job at Zurich and determined that it fell in the medium work category. App. at PLACL00222–30. However, Perdue concluded that the plaintiff could return to her job even though the FCE listed her work capacity as light. *Id.* Like Dr. Beecher, Perdue relied on the physical therapist's remark that it was "questionable" whether the plaintiff had performed at full capacity during the FCE.App. at PLACL00229 –30.

The claims file at this point included letters from the plaintiff's physicians describing her disorder.[5] After performing an electromyography,[6] Dr. Sea Hun Kim wrote to Dr. Robert Cherrey, Dorsey's primary care physician, that "[u]pon palpitation of the upper back the patient has an exquisite tender point in both upper trapezius muscles. She also has a tender point on the right rhomboid and also the left middle trapezius in rhomboid muscles." App. at PLACL00024. Dr. James Burke, the plaintiff's neurologist, also wrote to Dr. Cherry that "[Dorsey] continues to have significant tenderness with trigger points over the trapezii, deltoid, cervical paraspinal musculative, and occipital musculature as well as the interscapular region.... She does have the clinical symptoms consistent with the diagnosis of fibromyalgia as well." App. at PLACL00426–27. Dr. Burke followed up this letter with another dated April 28, 1999 where he noted that "[t]here are numerous points of exquisite tenderness on palpation along the trapezii, paraspinal muscles, particularly in the interscapular and suprailiac regions as well as in the quadriceps and glutei.... I believe that Ms. Dorsey has fibromyalgia." App. at PLACL00409–10. Furthermore, the medical records included a letter from Dr. Stephen Lewis, the independent doctor hired by the plaintiff's short-term disability provider. Dr. Lewis wrote that

> Ms. Dorsey's examination is consistent with the diagnosis of fibromyalgia. She has considerable muscular pains without alteration of neurological examination. This disorder may be quite difficult to bring under control. It is usually quite frustrating (as it is to Ms. Dorsey). As she is here in the office, I did not see how she would be able to physically function at her prior position which required traveling.

App. at PLACL000481–82.

Provident denied Dorsey's claim on January 10, 1999. App. at PLACL00282. The plaintiff appealed Provident's decision to deny long term disability benefits in March 2000. App. at PLACL00246–47. During the appeal process, the plaintiff submitted medical additional medical records including another doctor's opinion, office notes from her psychologist, and more information from her rheumatologist. App. at PLACL00257–62 & PLACL00325–

---

5. The *DCM* review, dated September 29, 1999, briefly refers to these letters. App. at PLACL00071.

6. This is a test to measure muscle response to nerve stimulation. It is used to evaluate muscle weakness and determine if the problem is caused by the muscles themselves or the nerves connected to the muscles. *The Merck Manual* 1354–55 (17th ed.1999).

516. Dr. Charles Pritchard, who wrote that Dorsey had tried numerous medications with only minor benefit, agreed with the plaintiff's rheumatologist that she would not be able to return to work. Dr. Pritchard stated:

[Ms. Dorsey] has classic fibromyalgia and meets the American College of Rheumatology Criteria for this disease.... I suggest that most likely Cheryl will never be able to return to her past position as Director of Sales and Marketing or any other position requiring the same demands. Unfortunately until her pain and other symptoms can be controlled, she would not be able to sustain any position.

App. at PLACL00260–61. Furthermore, Dr. Chesner explained that "Mrs. Dorsey could get a job, but she would not be able to sustain it for more than a week or two." App. at PLACL00364. Dr. Chesner also added:

Ms. Dorsey's symptoms affect various parts of her body, causing her to be unable to function in any capacity. It is important to note that Cheryl had the ability on a given day to function for very short periods of time. However, this activity results in severe pain and the inability to function for 48 to 72 hours.... Although Cheryl may be able to secure employment because of her past work record, she would not be able to perform on a consistent basis to sustain employment. Normal work related activities such as walking, driving, writing, computer work, bending, and turning her head, etc. result in her being unable to function for an undetermined time period. An employer would not be able to work with the unreliable nature of her illness. The fact that she can perform these activities at a given time does not take into consideration the consequences of those actions when dealing with this disease.

App. at PLACL00404. Also included in the appeal were notes from the plaintiff's psychologist diagnosing her with major depressive disorder. App. at PLACL00348.

On September 12, 2000, Dr. Nancy Beecher, the same person who conducted the plaintiff's initial physician review, evaluated the additional medical information and concluded that nothing had changed. App. at PLACL00265–67. Dr. Beecher reported that "[the new medical records] do not support any physical medical impairment that would cause [Dorsey] to be unable to do a sedentary to light physical demand job." App. at PLACL00265–67. During the appeal process, the Social Security Administration awarded the plaintiff disability benefits, and Dorsey's attorney forwarded this information to Provident's appeal division. App. at PLACL00268–77. On October 31, 2000, Provident denied the plaintiff's appeal. App. at PLACL00284–85.

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter. Rather, it determines whether or not there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, all of the facts must be viewed in the light most favorable to, and all reasonable inferences must be drawn in favor of, the nonmoving party. *Id.* at 256, 106 S.Ct. 2505.

The moving party has the burden of showing there are no genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mathews v. Lancaster General Hosp.,* 87 F.3d 624, 639 (3d Cir. 1996). In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548; *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989). Rather, there must be evidence on which a jury could reasonably find for the nonmovant. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505. "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

### B. Denial of Benefits under ERISA

■ Because the insurance policy at issue is an employee benefit plan, this action is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* In *Firestone Tire & Rubber Company v. Bruch,* the Supreme Court set forth the standard for reviewing a denial of benefits under an ERISA plan. 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). According to the Court, a denial of benefits must be reviewed *de novo* unless the plan gives the administrator discretionary authority to interpret the terms of the plan. *Id.* at 115, 109 S.Ct. 948. In the latter instance, judi-

cial review is limited to determining whether the administrator abused her discretion. *Id.* The Third Circuit subsequently held that district courts should apply the arbitrary and capricious standard of review when a plan grants discretionary authority to a plan's administrator.[7] *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 44–45 (3rd Cir.1993). Under this standard of review, a court may not overturn an administrator's decision unless that decision "is not clearly supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." *Id.* at 41.

In announcing the appropriate standard of review in ERISA actions, the Supreme Court in *Firestone* also instructed courts to be wary of an administrator's conflict of interest. The Court wrote "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, then that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone,* 489 U.S. at 115, 109 S.Ct. 948. The Third Circuit has interpreted this comment in *Firestone* to require application of a heightened arbitrary and capricious standard when an insurance company both determines eligibility for benefits and pays those benefits out of its own fund. *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 383, 387 (3rd Cir.2000). According to the Third Circuit, there is a strong incentive for an insurance company to deny benefits when "the fund from which monies are paid is the same fund from which the insurance company reaps its profits." *Id.* at 378. In recognition of this potential for conflict, the Third Circuit directed district courts to utilize a "sliding scale approach, according different de-

---

**7.** The "arbitrary and capricious" standard of review is essentially the same of the "abuse of discretion standard." *Abnathya v. Hoff-* *mann–La Roche, Inc.,* 2 F.3d 40, 45 n. 4 (3rd Cir.1993).

grees of deference depending on the apparent seriousness of the conflict." *Id.* at 391. Such an approach "allows each case to be examined on its facts." *Id.* at 392. Factors a court may take into account in determining the appropriate degree of deference to be employed include: "the sophistication of the parties, the information accessible to the parties, ... the exact financial arrangement between the insurer and the company [and] the current status of the fiduciary." *Id.* Moreover, a court should look not only at whether the result is supported by reason but also "at the process by which the result was achieved." *Id.* at 393. A heightened arbitrary and capricious standard of review is a "range, not a point [that is] more penetrating the greater ... the suspicion of partiality, less penetrating the smaller [the] suspicion." *Id.* at 392–393 (citation, punctuation omitted).[8]

### III. Discussion

#### A. Standard of Review

■ Although the policy at issue in this case does not contain an express grant of discretionary authority to Provident, a plan's terms may imply discretionary powers even if they are not granted expressly. *Luby v. Teamsters Health, Welfare, and Pension Trust Funds,* 944 F.2d 1176, 1180 (3rd Cir.1991). Provident's policy states that benefits will only be awarded if there is "proof of loss," which is defined as written evidence satisfactory to Provident that a claimant is disabled. App. at PLACL00297. In *Pinto,* the Third Circuit found that similar proof-of-loss language implied discretionary authority in the plan's administrator. *Pinto,* 214 F.3d at 378. Furthermore, the plaintiff concedes

that Provident had discretionary authority to determine benefit eligibility. Pl.'s Mem. in Support of Mot. for Summ. J. at 14. Therefore, this court must apply the arbitrary and capricious standard to Provident's decision to deny benefits to Ms. Dorsey.

■ Now the question becomes whether to apply a heightened arbitrary and capricious standard under *Pinto.* The defendant concedes that it both funds and determines eligibility for benefits under the plan at issue and that *Pinto's* heightened arbitrary and capricious standard should apply. Def.'s Mem. in Support of Summ. J. at 10. Defendant, however, argues that the scale should slide only slightly away from a very deferential review because there is no evidence in the administrative record that Provident's handling of the claim was affected by a conflict of interest. However, as fully discussed in this court's memorandum and order of even date granting plaintiff's motion for the inclusion of evidence outside the administrative record, this court is not limited to the administrative record in determining what level of deference to apply to the claim administrator's decision.

■ While courts must examine the nature and degree of an administrator's conflict of interest, there is rarely " 'smoking gun' direct evidence of purposeful bias...." *Pinto,* 214 F.3d at 379. In *Pinto,* the Third Circuit found the procedural anomalies of the particular claim at issue indicated a significant conflict of interest. *Pinto,* 214 F.3d at 394. In that case, the Third Circuit noted that the insurance company reversed its initial decision to award benefits, ignored a staff worker's

---

**8.** In *Pinto,* the Third Circuit acknowledged that the concept of a heightened arbitrary and capricious standard that is to be employed on a sliding scale is somewhat "intellectually unsatisfying," but noted that such an approach

was the best method to reconcile *Firestone's* dual commands to apply the arbitrary and capricious standard and to also modify that standard depending on the degree of conflict. *Pinto,* 214 F.3d at 392–93.

recommendation to reinstate benefits, and selectively relied on a doctor's specific limitations to reject the claim while ignoring the doctor's diagnosis of disability. *Pinto,* 214 F.3d at 393–94. In the plaintiff's claim there are similar procedural anomalies, although they are more structural in nature. While different divisions within Provident handled Dorsey's initial claim and her appeal, Dr. Beecher conducted both the plaintiff's first medical review as well as her appellate medical review. Dr. Beecher reviewed her own work during the appeal process and, not surprisingly, came to the same conclusion both times. Furthermore, Noel Haynes, the appeals consultant responsible for Ms. Dorsey's appeal, could not independently reverse Provident's denial of benefits. As Haynes admitted in a deposition:

Q: [C]an you change that decision [to deny benefits]?

A: I can make a recommendation to change the decision?

Q: And who do you make that recommendation to?

A: The people who made the decision.

Q: In other words, you could send it back to the general med unit? ...

A: Yes, I would contact them and advise them of the reasons why I came to a different conclusion and sit down and discuss it with them.

Q: And then what would happen?

A: And then once *we* had an agreement, then *we* would proceed with a recommendation.

App. to Pl.'s Mot. for Inclusion of Evidence at 10 (dep. of N. Haynes) (emphasis added). Even though Haynes agreed with initial decision to deny benefits to Dorsey, the fact that he must confront the people who made that decision is a strong disincentive to attempt to overturn a benefits denial. These procedural anomalies indicate a less-than-impartial appeal process designed to make it more difficult for an appellant to succeed. With fewer successful appeals, Provident's profits are greater. Because these anomalies are evidence of a significant conflict of interest, this court places the arbitrary and capricious standard at the far end of the sliding scale and accordingly will review Provident's decision with a "high degree of skepticism." *Pinto,* 214 F.3d at 395.

## B. Review of Provident's denial

■ As noted previously, this court's substantive review of. Provident's decision is limited to the evidence that was before the administrator at the time of the benefit denial. *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433 (3rd Cir.1997). The evidence in the record that supports Provident's denial of benefits is the DCM review questioning the fibromyalgia diagnosis, the medical reviews performed by Dr. Beecher, the vocational therapist review, the functional capacity evaluation, and the surveillance video tape. Even when viewed in a light most favorable to the defendant, it is clear that Provident's denial of benefits was arbitrary and capricious.

First, the court finds that the defendant's medical review of the plaintiff's claims file was incomplete and inaccurate. In the DCM review, Nurse Kennelly questioned the diagnosis of fibromyalgia because "none of the doctors list all of the trigger points ..." and there was no diagnosis of depression that is usually present in fibromyalgia patients. However, Dr. Kim, Dr. Burke, and Dr. Chesner all list Dorsey's trigger points in their letters describing her condition. Furthermore, Dr. Chesner noted in his letter of October 8, 1999 that the plaintiff suffered from depression, and the plaintiff's psychologist submitted medical records diagnosing her with major depressive disorder. Even though the plaintiff submitted data that responded to Kennelly's specific concerns,

Provident's staff ignored the fact that Dorsey exhibited classic symptoms of fibromyalgia. While the defendant cites the DCM review as evidence that there was no medical support for a fibromyalgia diagnosis, Def.'s Resp. to Pl.'s Mot. for Summ. J. at 3, this court disagrees. According to Kennelly's description of the disorder and the medical information contained in the record, there is no question that Dorsey suffered from fibromylagia.

Most unreasonable is Dr. Beecher's review of the claims file. Dr. Beecher never examined Dorsey personally and, during the initial claims process, only referenced the FCE and video surveillance in her medical review. When Dr. Beecher reviewed Dorsey's claim on appeal, she cited some of the plaintiff's medical records but failed to address the evidence supporting Dorsey's contention that she was disabled. Dr. Beecher's cursory report did not discuss the significance of plaintiff's irritable bowel syndrome, migraine headaches, and major depression—all symptoms that support a diagnosis of fibromyalgia. In her report Dr. Beecher gave no explanation for her rejection of Dr. Chesner's diagnosis and only referred to the plaintiff's lack of laboratory abnormalities. However, there is no test that can be performed to confirm the diagnosis since fibromyalgia only manifests itself through clinical symptoms.[9]

While Provident may not have had a duty to obtain an independent medical review of the claimant,[10] the fact that five doctors diagnosed Dorsey with a severe case of fibromyalgia and three concluded she was permanently disabled suggests that Provident's medical review needed to be more substantial than a half page summary of selective information.

This court is also highly skeptical of the vocational rehabilitation consultant's conclusions that Dorsey could return to her pervious position. In order to be eligible for long term disability benefits under Provident's plan, a covered person must be "unable to perform all the material duties of their *own* occupation on a full-time or part-time basis...." App. at PLACL00310 (emphasis added). Under Provident's policy, a claimant does not need to prove that she is unable to perform any occupation. *Id.* Based on Dorsey's functional capacity evaluation, Pam Perdue, the consultant, concluded that Dorsey had the physical capacity to return to her job. However, Perdue never evaluated Dorsey's *actual* job description and requirements. Even though Provident was aware that Dorsey's job required traveling, the vocational consultant never addressed this issue. Even though the FCE placed Dorsey's ability to work in the light category, and Perdue determined her job fell in the medium

---

**9.** *Harrison's Principles of Internal Medicine* 1706–07 (Kurt J. Isselbacher, et al., eds., 13th ed.1994).

**10.** *See e.g., Leonardo–Barone v. Fortis Benefits Ins. Co.,* 2000 U.S. Dist. LEXIS 19001, *34 (E.D. Pa 2000) ("The decision to rely only upon a review of the written submissions does not render the denial arbitrary since by doing so Fortis violated no provision of the policy."); *Marques v. Reliance Standard Life Ins. Co.,* 1999 WL 1017475 *5 n. 2, 1999 U.S. Dist. LEXIS 17406, * 16 n. 2 (E.D.Pa.1999) ("[T]he Policy does not grant the plaintiff a right to an independent medical examination. Rather, the Policy grants the defendant the right, if it chooses, to have a claimant interviewed or examined."); *Lawyer v. Hartford Life and Accident Ins. Co.,* 100 F.Supp.2d 1001, 1010–11 (W.D.Mo.2000) (finding that Hartford Life did not breach its fiduciary duty when it chose not to obtain an independent medical review); *Eriksen v. Metropolitan Life Ins. Co.,* 39 F.Supp.2d 864, 871 (E.D.Mich. 1999) ("Plaintiff makes no argument challenging MetLife's interpretation of the medical evidence presented. Rather, he contends that MetLife acted arbitrarily and capriciously in denying his claim for benefits because it did not order that he undergo an independent medical examination before making its decision.").

category, Perdue still found that the plaintiff could return to her job. In light of the inadequate review, the consultant's conclusion that the plaintiff could return to work is unreasonable.

In addition, throughout the claims process, Provident employees frequently pointed to the FCE and surveillance videotape as evidence that Dorsey was not disabled. In particular, Dr. Beecher and the vocational consultant both relied on the physical therapist's questioning of the plaintiff's effort during the FCE. However, the therapist ultimately concluded that Dorsey could perform work in the "light" category of work. While the therapist merely questioned Dorsey's performance, Provident employees essentially concluded that Dorsey could do heavier work than the FCE actually indicated. Furthermore, there is evidence that an FCE is a highly questionable tool for determining whether a fibromyalgia patient is disabled. As Dr. Chesner noted in his letter to Dorsey's attorney, a patient who suffers from fibromyalgia may be capable of performing some tasks for brief periods of time and yet will not be able to sustain activity for long periods of time. In addition, the surveillance tape offers no support for Provident's contention that Dorsey could return to work. The fifteen minute videotape is the product of three days of surveillance and only captures Dorsey driving her children to school on one occasion and slowly walking across a parking lot. Provident's substantial reliance on the FCE and surveillance tape is unreasonable.

Finally, every doctor who personally examined the plaintiff determined that she suffered from a severe case of fibromyalgia. None of these doctors concluded that Dorsey was capable of returning to her position as Director of Payroll Marketing. Notably the plaintiff also qualified for both short term disability benefits from another provider as well as social security benefits.[11] In sum, every individual or organization that examined or reviewed the plaintiff's medical information found the plaintiff to be disabled—everyone except those individuals employed by Provident.

The medical reviews conducted by Provident were incomplete and disregarded the substantial evidence of disability as submitted by plaintiff's treating physicians. The vocational consultant's evaluation inadequately assessed plaintiff's ability to return to her job. Furthermore, the FCE and the surveillance tape provide no support for Provident's finding of no disability. For these reasons, Provident's denial of plaintiff's benefits is simply not supported by reason. Even when viewed in the light most favorable to the defendant, Provident's denial of Dorsey's claim is ar-

11. The defendant argues that the Social Security Administration's (SSA) grant of disability benefits is "neither persuasive nor relevant" in reviewing Provident's decision. Def.'s Reply Brief to Pl.'s Mot. for Summ. J. at 6. The court agrees that a Social Security award does not in itself indicate that an administrator's decision was arbitrary and capricious, and that a plan administrator is not bound by the SSA decision. *See Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279, 1286 (9th Cir.1990); *Pari–Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415 (1st Cir.2000); *Russell v. Paul Revere Life Ins. Co.*, 148 F.Supp.2d 392 (D.Del.2001); *Forchic v.*

*Lippincott*, 1999 U.S. Dist. LEXIS 21419 (D.N.J.1999). As the court stated in *Russell*, "a plan administrator's decision on ERISA disability that differs from that of the SSA is not arbitrary and capricious provided it is 'reasonable and supported by substantial evidence.' " *Russell*, 148 F.Supp.2d at 409 (citations omitted). But while an SSA award is not dispositive in determining whether an ERISA administrator's decision was arbitrary and capricious, it may be considered in as a factor. *See e.g., Wilkerson v. Reliance Standard Life Ins. Co.*, No. 99–4799, 2001 WL 484126 at *1 (E.D.Pa. Mar.6, 2001).

bitrary and capricious, there is no genuine issue of material fact, and the plaintiff is entitled to judgment as a matter of law. In fact, this court finds that the evidence weighs so heavily in favor of the plaintiff that plaintiff's motion would succeed even if the court were to apply a deferential arbitrary and capricious standard.

## IV. Conclusion

For the foregoing reasons, the plaintiff's motion for summary judgment is granted and the defendant's motion for summary judgment is denied.

An appropriate order follows.

### ORDER

**AND NOW,** this 5th day of October, 2001, upon consideration of Plaintiff's Motion for Summary Judgment, the Defendant's Motion for Summary Judgment, the responses thereto, Defendant's reply to Plaintiff's response, and after a hearing, is it hereby **ORDERED** that plaintiff's motion is **GRANTED** and defendant's motion is **DENIED.**

### JUDGMENT

**AND NOW,** this 5th day of October, 2001, judgment is entered on the claims in **FAVOR** of plaintiff, Cheryl Dorsey, and **AGAINST** defendant, Provident Life and Accident Insurance Company.