**Sharon Taylor BROWN, Plaintiff**

v.

**CONTINENTAL CASUALTY COMPANY, Defendant**

**No. Civ.A. 99–6124.**

United States District Court, E.D. Pennsylvania.

Sept. 10, 2004.

Carl N. Martin, II, Philadelphia, PA, Lead Attorney, for Sharon Taylor Brown, Plaintiff.

Michael J. Burns, Christie Pabarue Mortensen Young, Philadelphia, PA, Lead Attorney, for Continental Casualty Company, Defendant.

## OPINION

POLLAK, District Judge.

A two-day trial was had in this action brought under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.[1]   Plaintiff Sharon Taylor Brown

---

1.   Section 502(a)(1)(B) of ERISA permits the beneficiary of an ERISA-governed plan to

contended at trial that defendant Continental Casualty Company ("CNA"),[2] her employer's disability insurance carrier, improperly terminated Ms. Brown's long-term disability benefits in May 1999. CNA claimed that the termination was proper, asserting that Ms. Brown's fibromyalgia and related limitations did not constitute "total disability" under the terms of her insurance policy. Reviewing Ms. Brown's claims *de novo*, I find that she is indeed entitled to receive the disputed benefits, and will enter judgment accordingly. This opinion constitutes my findings of fact and conclusions of law.

## I.

Ms. Brown is a 51–year–old woman who, it is not disputed, has suffered from a series of medical and psychological problems over the past two decades. Most notable among them, for the purpose of this case, is fibromyalgia. Fibromyalgia is

a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body . . . that when pressed firmly cause the patient to flinch.

*Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir.1996) (citations omitted). For Ms. Brown, according to her testimony, fibromyalgia takes the form of pain in her head, neck, shoulders, arms, lower back, legs, ankles, and arches; coldness and tingling in her hands and fingers; and intermittent profound fatigue. These symptoms vary in intensity. On most days, Ms. Brown is able to engage in such tasks as dressing and bathing herself, preparing lunch for herself, cleaning the sink and counters, and driving a car. However, she is only able to do "normal things," such as laundry and grocery shopping, "maybe a couple times a month," Trial Tr., Nov. 17, 2003, at 28–29, and is totally bedridden an average of one day per week. Although Ms. Brown has been prescribed a host of medications and therapies, none has provided her with more than temporary relief.

From October 1992 to September 1996, Ms. Brown was employed by the Vanguard Group ("Vanguard") in Malvern, Pennsylvania, working full-time as a Communication Associate. This position was sedentary in nature; Ms. Brown's duties included selling stocks and mutual funds and determining clients' investment needs, which involved working on computers, filling out paperwork, and talking on the phone.

As part of her benefits package with Vanguard, Ms. Brown was insured by CNA under both a short-term disability ("STD") and a long-term disability ("LTD") insurance policy. Only Ms. Brown's eligibility for benefits under the LTD policy is at issue in this suit. The LTD policy committed CNA to pay a monthly benefit of two-thirds of Ms.

bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

**2.** Continental Casualty Company is a member of the CNA insurance group, and will hereinafter be referred to as "CNA."

Brown's salary, reduced by any other disability or retirement benefits received, for every month she remained totally disabled after a 180–day "Elimination Period."[3] Joint Ex. 3. Under the terms of the policy, " 'Total Disability' means that, because of Injury or Sickness, the Insured Employee is: (1) continuously unable to engage in any occupation for which [s]he is or becomes qualified by education, training or experience; and (2) under the regular care of a licensed physician other than [her]self." *Id.* at 3.[4] The policy defines "Sickness" as "sickness or disease causing loss which begins while the Insured Employee's coverage is in force," and excludes loss resulting from a pre-existing condition. *Id.*

In early September 1996, while working for Vanguard, Ms. Brown testified that she began to experience flu-like symptoms, including a headache, sore throat, swollen glands, fever, and pain throughout her body. Ms. Brown last worked at Vanguard on September 6, 1996. On September 12, 1996, Ms. Brown submitted a claim for STD benefits to CNA, supported by a note from her physician, Dr. Michael Warner. Dr. Warner's note stated that Ms. Brown had been under his care, "most recently for pneumonia and newly diag-

nosed hypothyroidism," and that neither condition had responded to medication. The note also stated that due to Ms. Brown's fatigue it would be "medically necessary for her to be out of work on Short Term Disability" for "most likely 2 weeks at which time [Dr. Warner] would reevaluate her." Joint Ex. 5, at 236–37. Ms. Brown's benefits application led to a series of eligibility determinations by CNA, culminating in the 1999 decision to cease paying LTD benefits. While CNA's assessments of Ms. Brown's eligibility for STD benefits are not directly at issue here, the following summary provides background for CNA's ultimate denial of Ms. Brown's LTD benefits.

Ms. Brown began receiving STD benefits on or about September 16, 1996, and CNA formally approved her claim on September 26, 1996, for a period through October 1, 1996. CNA subsequently extended Ms. Brown's period of short-term disability due to additional diagnoses of fibromyalgia and arthritis by her rheumatologist, Dr. Ronald E. Krauser, in November 1996. CNA later explained to Ms. Brown that it had approved the payment of STD benefits during this initial period "on a 'qualified basis', while fur-

---

3. The requirements and definitions discussed here apply to covered individuals in "Class I"—full-time employees, such as Ms. Brown, who are not in Vanguard's upper management. Specifically, the LTD policy required CNA to "pay the Monthly Benefit for each month of Total Disability which continues after the Elimination Period." Joint Ex. 3, at 4. The "Monthly Benefit" is defined in Addendum 3 to the policy as two-thirds of the employee's salary or $10,000 per month, whichever is less, reduced by the amount of other disability or retirement benefits paid to the employee. The "Elimination Period," according to Addendum 3, is 180 days.

4. The policy contains two separate definitions of "total disability." During the first 24 months after an employee is deemed to be

eligible for LTD benefits, "total disability" means that, because of injury or sickness, the employee is "continuously unable to perform the substantial and material duties of [her] regular occupation." Joint Ex. 5, at 3. If more than 24 months have elapsed since the employee became eligible for LTD benefits, the more stringent definition of "total disability" quoted above applies, and the employee must be unable to engage in *any* occupation for which she is qualified. *Id.* CNA deemed Ms. Brown eligible for LTD benefits as of May 21, 1997, and terminated her benefits effective May 31, 1999. Because the termination of Ms. Brown's benefits occurred 24 months and 10 days after her eligibility for LTD benefits began, the more rigorous definition applies in this case.

ther medical documentation was being obtained." Joint Ex. 5, at 93.

After this initial approval, CNA received Ms. Brown's medical file from Dr. Krauser. Included in the file was a report by Dr. John Kraus, a physiatrist to whom Dr. Krauser had referred Ms. Brown for an evaluation. Dr. Kraus concluded that Ms. Brown's symptoms of pain in her arms and legs were consistent with fibromyalgia or myofascial syndrome,[5] and that she might have carpal tunnel syndrome. After reviewing Ms. Brown's file, however, CNA informed Ms. Brown by letter dated March 5, 1997, that she was no longer eligible for STD benefits as of January 31, 1997. CNA's letter stated that CNA could not identify sufficient objective medical findings to support a determination that Ms. Brown was totally disabled.[6]

Ms. Brown appealed the decision to CNA's Appeals Committee. Among the materials that the Appeals Committee considered in reviewing her claim were updated reports from Dr. Krauser and Dr. Kraus, along with reports from Dr. Sandra C. Gilmour, a psychologist, and Dr. June M. Fry, a neurologist who specializes in sleep disorders. Dr. Krauser's report stated that he had examined Ms. Brown on April 9, 1997, and she had experienced no significant improvement. According to Dr. Krauser, Ms. Brown continued to have major sleep problems, major tenderness over all fibromyalgia trigger points, and "severe, unremitting and chronic musculoskeletal pain ... associated with stiffness, chronic fatigueability (sic) and non-restorative sleep patterns." Joint Ex. 5, at 132–33. Dr. Krauser emphasized that, in his opinion, Ms. Brown was "unable to work in any capacity." Joint Ex. 5, at 133. Dr. Kraus reported that, at a follow-up visit on March 17, 1997, Ms. Brown had experienced no significant tenderness on palpation of the cervical area, lumbar area, or the thigh or calf of either leg.

Dr. Gilmour stated that she had engaged in individual psychotherapy sessions with Ms. Brown on eight occasions since December 1996. She diagnosed Ms. Brown with anxious depression, and stated that Ms. Brown was struggling with symptoms of depression, anxiety, fatigue, insomnia, memory problems, and dizziness, along with a number of physical symptoms. Dr. Fry reported that she was continuing to treat Ms. Brown for her sleep disorder, a problem that Ms. Brown testified has afflicted her since 1984 or 1985. Dr. Fry's report indicated that Ms. Brown's sleep disorder had gotten "progressively worse" between November 1996 and April 1997, and that Ms. Brown was now getting less than four to five hours of sleep per night due to severe pain, back spasms, and leg banging. Joint Ex. 5, at 123. Dr. Fry stated that "[i]t seems likely

---

5. Myofascial syndrome has been defined as " 'irritation of the muscles and fasciae (membranes) of the back and neck causing chronic pain (without evidence of nerve or muscle disease).' " *Smith v. J.I. Case Corp.*, 163 F.R.D. 229, 231 (E.D.Pa.1995) (quoting *Schmidt's Attorneys' Dictionary of Medicine* M–323 (1978)).

6. CNA also relied in part on a statement, attributed to Dr. Krauser, indicating that Ms. Brown was ready to return to work at her regular sedentary occupation as of January 8, 1997. The statement appears in the notes of CNA claims representative Sharon Maloney, recording a telephone conversation between Ms. Maloney and Dr. Krauser on February 27, 1997. Dr. Krauser denies that he made such a statement. He wrote to CNA on April 14, 1997, stating, "I, therefore, do not agree with the conclusions that I supposedly told you that she could return to work. I stated in our conversation that I do not think that she can work in her previous capacity. I want to again stress that I doubt that she can work in any capacity at this point in time." Joint Ex. 5, at 133.

that Mrs. Brown's severe sleep disorders are contributing to the pain of her fibromyalgia. It is definite that her severe lack of sleep is contributing to her very poor emotional state.... Mrs. Brown is clearly disabled and unable to return to work at this time." Joint Ex. 5, at 123–24.

After reviewing Ms. Brown's file and considering the new information provided by her physicians, CNA's Appeals Committee upheld the denial of her STD benefits, informing Ms. Brown of its decision by letter dated June 12, 1997.

On September 4, 1997, Ms. Brown was examined for the first time by Dr. Lawrence J. Leventhal, another rheumatologist. Dr. Leventhal's examination revealed that Ms. Brown had "marked paracervical muscle spasm with loss of her lumbar lordosis," "paralumbar spasm," "trigger points scattered about in classic fibromyalgia locations," and a "painful range of motion of all her joints especially those involving the neck and low back." Joint Ex. 5, at 105. Dr. Leventhal concluded that "[m]y impression is that Sharon does have very severe fibromyalgia." *Id.*

On September 8, 1997, Vanguard's benefits manager, Diane K. White, wrote to CNA, informing the insurer of Dr. Leventhal's assessment and urging CNA to conduct further review of Ms. Brown's STD claim. In response, CNA undertook to reexamine Ms. Brown's file, including additional reports from Dr. Leventhal and Ms. Brown's other physicians that had been submitted after the Appeals Committee had rendered its decision of June 12, 1997. Among them was a letter from Dr. Krauser stating that, as of July 15, 1997, Ms. Brown had no articular inflammation, but continued to have "diffuse soft tissue tenderness virtually from head to toe," most notably over typical fibromyalgia trigger points. Joint Ex. 5, at 112. He once

again offered his opinion that Ms. Brown's chronic pain and fatigue rendered her unable to work. Also, Dr. Gilmour wrote that from April 1 through August 6, 1997, Ms. Brown had undergone nine sessions of psychotherapy treatment with her for anxious depression. Dr. Gilmour reported that "Ms. Brown's situation must now be considered to be chronic rather than acute. She will need to live within her limitations. One of the limitations is that she is physically and emotionally unable to work." Joint Ex. 5, at 115.

In evaluating these new medical records, CNA commissioned Dr. Albert Ziffer to conduct an independent review of Ms. Brown's file and offer a medical opinion as to whether her condition would preclude her from performing an essentially sedentary occupation. After reviewing the file, Dr. Ziffer acknowledged that Ms. Brown had been diagnosed with fibromyalgia, as well as a sleep disorder and anxious depression. He concluded that before Ms. Brown's visit to Dr. Krauser on April 9, 1997, there was no substantive objective evidence that she had any condition or functional impairment that prevented her from performing her sedentary job. Beginning with Dr. Krauser's evaluation on April 9, 1997, however, "all the physicians began to make a clear case that the claimant was unable to return to her job." Joint Ex. 5, at 99. Although Dr. Ziffer found that the basis for their opinion was "only subjective symptoms of sleep deprivation and pain, as described by the claimant," he believed that their opinion of total disability should be accepted for the period commencing April 9, 1997.

Dr. Ziffer also recommended that CNA take certain additional steps to determine whether Ms. Brown was unable to do sedentary work. Among those steps, Dr. Ziffer recommended that Ms. Brown complete a functional capacity evaluation

("FCE"),[7] to examine her ability to engage in various work-related physical movements (lifting, sitting, etc.). Dr. Ziffer also noted that while each of Ms. Brown's physicians had stated that she was unable to work *at that time,* none had stated that she was permanently unable to work. If it was later determined that Ms. Brown could drive and pursue her activities of daily living ("ADLs"), Dr. Ziffer wrote, then he would alter his opinion to state instead that she was able to work.

On October 15, 1997, based on this re-review of Ms. Brown's file, CNA's Appeals Committee reversed its previous decision and granted Ms. Brown retroactive benefits for April 9, 1997, through May 20, 1997. (The STD coverage ended by the terms of the policy on the latter date.) Adopting Dr. Ziffer's recommendation, CNA did not reinstate Ms. Brown's benefits for the period of February 1, 1997, to April 8, 1997, because it found that "the medical records prior to April 9, 1997 did not provide substantive objective evidence of any condition or functional impairment that would have prevented [her] from performing the duties of [her] sedentary occupation." Joint Ex. 5, at 93. As of April 9, however, the medical documentation satisfied CNA that Ms. Brown was unable to do any type of work.

On November 5, 1997, soon after granting the retroactive STD benefits, CNA also determined that Ms. Brown was eligible for benefits under her LTD policy, both retroactively and prospectively. CNA issued Ms. Brown a payment of $7,456.72 for unpaid LTD benefits since May 21, 1997. CNA also approved a monthly benefit of $1,389.45—a sum which, as provided in the disability policy, reflected two thirds of Ms. Brown's former monthly salary—as long as Ms. Brown remained disabled under the terms of the policy. Joint Ex. 5, at 82, 88.

Ms. Brown continued to receive her monthly LTD benefits for some time. In November 1998, though, CNA requested that Ms. Brown undergo an FCE. CNA arranged for the evaluation to be conducted on November 23, 1998, by a physical therapist at Healthsouth Rehabilitation Center of Norristown. The FCE involved tests of Ms. Brown's tolerance for various types of physical exertion, such as sitting, standing, lifting objects, and completing assorted movements and stretches. Based on the FCE results, the Healthsouth examiner reported that Ms. Brown was "capable of light duty work on an occasional basis." Joint Ex. 5 at 55. The examiner also found that Ms. Brown demonstrated "inconsistent effort" in the tests. *Id.* Medical Review Associates, which reviewed and summarized the results of Healthsouth's testing for CNA, found that Ms. Brown's physical capabilities exceeded those needed for a sedentary job, even if the tests failed to reflect her maximum capabilities. Medical Review Associates also recommended further review of the relationship between the capabilities tested in the FCE and the "critical work demands" of Ms. Brown's job. Joint Ex. 5 at 54.

CNA then sought further review of Ms. Brown's file, including the results of the FCE, from Dr. Eugene Truchelut, a physician board certified in internal medicine. Dr. Truchelut found that Ms. Brown's file contained "insufficient medical evidence to assess her current physical status," aside from the FCE. Joint Ex. 5 at 61. However, Dr. Truchelut did not see "any evidence of functional limitations that would pre-

---

7. There appear to be varying interpretations of the acronym FCE. Dr. Ziffer actually used the term "functional capacities examination" in his report. In this opinion, I have adopted what seems to be the most widely used term, "functional capacity evaluation."

clude her from performing her sedentary job based on the available current information." *Id.* at 62.

After Dr. Truchelut's review, in a letter dated March 26, 1999, CNA informed Ms. Brown that it would be terminating her LTD benefits effective May 31, 1999. The letter stated: "We have carefully considered all the medical evidence contained in your file. We do not identify sufficient significant medical and/or clinical findings to support your total disability." Joint Ex. 5, at 34. Relying on the FCE, CNA informed Ms. Brown that no functional limitations appeared to preclude her from engaging in light or sedentary work, including her previous sedentary position.

Upon learning of CNA's decision, Dr. Krauser wrote to Yvonne Linwood of CNA on April 27, 1999, to "state categorically that [he] disagree[d]" with its conclusion that Ms. Brown was not totally disabled. Joint Ex. 5, at 31. In his letter, Dr. Krauser stated that Ms. Brown "has severe fibromyalgia with major soft tissue tenderness, pain, chronic fatiguability and sleep difficulties. She has been refractory to virtually all treatment options. She continues to have major soft tissue tenderness which significantly limits her ability to work." In Dr. Krauser's opinion, Ms. Brown "remain[ed] totally disabled from all occupations." Joint Ex. 5, at 31. Dr. Krauser also took exception to CNA's view of the results of Ms. Brown's FCE, explaining that the intermittent pain typical of fibromyalgia would predictably lead to inconsistent results for such testing. Finally, he objected to CNA's reliance on the opinions of persons "not thoroughly versed in the evaluation or treatment of fibromyalgia," rather than specialists. Joint Ex. 5, at 31.

Ms. Brown appealed CNA's termination of benefits on May 6, 1999. While her appeal was pending, she submitted a progress note from Dr. Leventhal, who discussed her symptoms and commented on the FCE. Like Dr. Krauser, Dr. Leventhal stated that FCEs are of "little value in chronic musculoskeletal pain syndromes" like Ms. Brown's, because pain often interferes with patients' ability to exert maximum effort in such tests. Joint Ex. 5 at 23–24. Dr. Leventhal also reemphasized that Ms. Brown does present some objective findings related to her claims.

Nonetheless, by letter dated August 27, 1999, the Appeals Committee upheld the decision to terminate Ms. Brown's LTD benefits, giving largely the same reasons as CNA's previous denials. CNA found that the evidence provided did not support a finding of any "body system damage or loss of functionality" that would prevent Ms. Brown from working. Joint Ex. 5, at 18–19. While acknowledging that Ms. Brown's illness involves largely subjective symptoms, CNA maintained that Ms. Brown had not provided "any detailed physical findings or medical evidence that would refute CNA's position." *Id.* at 19. CNA found that Dr. Leventhal's findings would preclude Ms. Brown from working in a hazardous environment, but not from holding a sedentary position. On December 2, 1999, Ms. Brown filed the present suit.

While pursuing her claim for benefits with CNA and in this action, Ms. Brown also applied three times for Social Security disability benefits. After her first application was denied, apparently due to a procedural defect, she applied a second time, and was examined on March 7, 2000, by Dr. Francis X. Burke III. Dr. Burke diagnosed Ms. Brown with chronic fatigue syndrome, fibromyalgia, a history of chronic depression, hypothyroidism, irritable bowel syndrome, and bronchial asthma. Based on his assessment, Dr. Burke reached the following conclusion:

[I]t would be very difficult for Mrs. Brown to perform any work activities at this time. I believe that her overriding depression and associated labile affect would make it difficult for her to be put in a work environment. Her chronic fatigue, polyarthralgias, [and] myalgias would restrict her from performing anything but light work with limited lifting and bending.

At this time, I do not believe she is capable of gainful employment based upon my evaluation today.

Joint Ex. 6, at 5–6. The Social Security Administration ("SSA"), apparently after considering Dr. Burke's report, denied Ms. Brown's application again.

Ms. Brown submitted a third application to the SSA for disability benefits in September 2000, and was examined by Dr. A. Cuozzo. Dr. Cuozzo diagnosed Ms. Brown with fibromyalgia with chronic fatigue, and chronic depression with anxiety, and concluded that "[t]he prognosis for Mrs. Brown depends upon control of her multiple medical and emotional problems." Joint Ex. 7, at 5. In May 2001, the SSA once again denied Ms. Brown's application.

However, after a hearing requested by Ms. Brown, the SSA reversed its decision in part. In a decision by Administrative Law Judge George C. Yatron, dated March 28, 2002, the SSA found that Ms. Brown was disabled from March 7, 2000 onward, but not before that date. This decision applied the Social Security Act's definition of total disability as "the inability to engage in any substantial gainful activity by reason of an impairment expected either to result in death or last for a continuous period of at least 12 months." Joint Ex. 9, at 5. Ms. Brown continues to receive her disability benefits from the SSA.

## II.

■ Ms. Brown seeks to restore her CNA disability benefits under ERISA § 502(a)(1)(B). Courts review such claims for benefits under a *de novo* standard unless the plan at issue gives the plan administrator discretionary authority to determine eligibility for benefits. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). *De novo* review applies to administrative decisions based either on interpretation of plan terms, as in *Firestone* itself, or on factual questions, as in this case. *Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176, 1182–83 (3d Cir.1991). Because the policy at issue here contains no language granting CNA discretionary authority to make eligibility determinations, the parties have stipulated, and the court agrees, that *de novo* review is appropriate. In exercising *de novo* review over a denial of benefits under ERISA, the court is not restricted to the record before the plan administrator. *Id.* at 1184–85.

■ Under *de novo* review, the court will independently evaluate Ms. Brown's disability benefits claim. Thus, it is immaterial whether CNA's denial of benefits was or was not reasonable on the evidence before it, and this opinion does not address that question. Based on an independent review of the administrative record and other evidence offered at trial, I conclude that Ms. Brown is disabled under the terms of the LTD policy.

The policy's definition of total disability applicable here requires that to receive benefits, Ms. Brown must be "(1) continuously unable to engage in any occupation for which [s]he is or becomes qualified by education, training or experience; and (2) under the regular care of a licensed physician other than [her]self."[8] Joint Ex. 3 at

---

8. As discussed above, a less stringent "own occupation" standard of disability applied for

3. The policy does not provide any more specific medical requirements or guidelines for determining disability. CNA does not dispute that Ms. Brown has been under the regular care of an appropriate physician, nor could it plausibly do so given the undisputed evidence of Ms. Brown's regular treatment by several physicians, principally including Dr. Ronald Krauser. I am persuaded that Ms. Brown also satisfies the policy's first requirement for total disability.

Both Ms. Brown and Dr. Krauser have testified that Ms. Brown's condition has remained essentially unchanged since 1996. According to Ms. Brown's testimony, which I find credible, she is typically bedridden with pain and fatigue an average of one day each week. She is unable to predict when this will occur, which in itself makes it difficult to imagine her working consistently enough to retain steady employment. Ms. Brown also testifies that she is able to participate only minimally in daily household chores, and her husband and daughter bear the brunt of such labor. Although on "good days" Ms. Brown is sometimes able to undertake more active tasks, the effort of doing so exacerbates her symptoms, and she frequently requires a day of bed rest to recover. Ms. Brown similarly required a day of rest to recuperate from the FCE she completed at CNA's request, an exam of only a few hours. This pattern of extreme weakness following exertion would also clearly limit Ms. Brown's ability to perform regular work. Also, since Ms. Brown's "good days" occur only "maybe a couple times a month," and unpredictably, it is unrealistic to expect her to hold employment based on her capabilities on those days. Trial Tr., Nov. 17, 2003, at 29. To evaluate Ms. Brown's disability and her realistic prospects for employment, I must consider the overall pattern of Ms. Brown's illness, not only her abilities as measured on any particular day. As presented to the court, this pattern makes it clear that Ms. Brown would be incapable of working in any occupation. .

■ Ms. Brown can, fortunately, still dress, bathe, and feed herself, as CNA is quick to point out. However, these and other minimal abilities do not equal an ability to work. Both Ms. Brown and her various physicians have provided credible accounts of her constant, disorienting pain. This pain in itself may be disabling, as the Third Circuit has recognized in the different, but somewhat analogous, context of Social Security benefit claims. *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 n. 10. (3d Cir.1987) ("Pain itself may constitute a disabling impairment."); Smith v. Califano, 637 F.2d 968, 971 (3d Cir.1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity."). Ms. Brown is not completely incapacitated by her symptoms, but she does appear completely unable to work in any regular occupation.

■ CNA's primary evidence against Ms. Brown's disability is the 1998 functional capacity examination (FCE), which CNA offers as proof that Ms. Brown is capable of physical exertion equivalent to a "light duty" position. As Dr. Krauser has noted, though, a test of strength like the FCE can neither prove nor disprove claims of disabling pain. Also, such a one-time test cannot hope to present a true picture of an illness characterized by variable symptoms. Others have noted the inadequacy of FCEs in determining disability in fibromyalgia cases. *See* Dorsey v. Provident Life & Accident Insurance Co., 167 F.Supp.2d 846, 856 (E.D.Pa.2001) (not-

the first 24 months that Ms. Brown was disabled.

ing "evidence that an FCE is a highly questionable tool for determining whether a fibromyalgia patient is disabled"). I likewise find the FCE unpersuasive in Ms. Brown's case.

CNA also appears to offer the FCE and Ms. Brown's failure to pursue certain possible treatments as evidence that Ms. Brown is, if not actively malingering, at least failing to exert the maximum possible effort in combating her fibromyalgia. However, I find persuasive Dr. Krauser and Dr. Leventhal's explanation that FCEs are of little value in evaluating fibromyalgia cases, and will often give misleading results. *See Dorsey*, 167 F.Supp.2d at 850 (dismissing similar suggestions that a fibromyalgia plaintiff had not "performed at full capacity" on an FCE). Moreover, Dr. Krauser and Ms. Brown both testified that Ms. Brown has aggressively attempted multiple modes of treatment, but that she has had little success in controlling her pain and other symptoms. Based on Dr. Krauser's testimony and Dr. Leventhal's findings, it appears that Ms. Brown's treatment has been appropriate for her condition. Ms. Brown ought not to be penalized for that treatment's ineffectiveness, or her apparent financial inability to pursue other possible treatments that her health insurance did not cover.

■ Besides the FCE, CNA also offers various medical opinions by doctors who have not personally examined Ms. Brown, but believe she is not disabled based on a review of her files. Although the Supreme Court has held that courts may not require ERISA administrators to defer to doctors who have treated a claimant over those who merely review her medical files,[9] the court may still evaluate the weight of each doctor's opinion based on the extent of his or her treatment history with the patient and specialization or lack thereof. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). CNA's evidence is lacking in both respects.

Direct contact with a patient over an extended period of time seems especially important for reliable evaluation of a disease as subjective and variable as fibromyalgia, since it can allow more thorough examination of the patient's credibility and true range of abilities. Except for the physical therapist conducting the FCE, none of the medical personnel CNA relies on has personally examined Ms. Brown even once. In contrast, Dr. Krauser has treated Ms. Brown for many years, and has had more opportunity than this court or CNA's medical reviewers to evaluate the sincerity and severity of her subjective complaints. I find his testimony that Ms. Brown is disabled more persuasive than the medical opinions CNA offers.

Similarly, although fibromyalgia may often be treated by nonspecialists, the opinions of those physicians who frequently encounter the disease offer valuable perspective on the relative severity of Ms. Brown's impairment. CNA's medical reviewers are not rheumatologists, and appear to have no special history of working with fibromyalgia patients. In contrast, both Dr. Krauser and Dr. Leventhal specialize in rheumatology, and believe that Ms. Brown has a severe, disabling case of fibromyalgia based on their experience treating the disease. Because of that experience, I find their opinions more valuable than those of the nonspecialists who reviewed Ms. Brown's file.

---

**9.** This deference applies in Social Security benefits claims, and is known as the "treating physician rule."

In addition to the direct medical evidence, CNA's previous handling of Ms. Brown's disability claim also offers some support for a finding of disability. CNA found Ms. Brown totally disabled from her own sedentary occupation for most of the time between her initial disability claim in September 1996 and its final termination of benefits in May 1999, awarding her first short-term and then long-term disability benefits. Ms. Brown had no more objective symptoms at that point than she presents today, yet CNA found her disabled. If Ms. Brown was then unable to work in a sedentary position due to pain and fatigue, as CNA found that she was, it is unrealistic to find her now capable of "light duty" work based on a one-time FCE finding that she could engage in some physical activities necessary for that level of work. The symptoms that supported Ms. Brown's successful claim for disability from her own physically non-demanding occupation are logically just as disabling for any other occupation.

■ Moreover, the Social Security Administration has found Ms. Brown to be totally disabled from any gainful employment since March 7, 2000, and continues to pay her disability benefits. The court is free to consider this determination in its analysis, although it is, of course, by no means binding. *See Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1314 n. 8 (11th Cir. 1999) (stating that reviewing court may consider Social Security finding of disability in evaluating ERISA disability claim);

*Starita v. NYLCare Health Plans, Inc.*, No. 98–5375, 2000 WL 330038, at 10 n. 7 (E.D.Pa. Mar.29, 2000) (following *Whatley* ). While not itself enough to establish Ms. Brown's disability, this decision has some persuasive weight in conjunction with the other evidence.[10]

■ To the extent that CNA relies on Ms. Brown's lack of objectively-proven physical impairments or defects, I find such arguments unconvincing in light of fibromyalgia's subjective nature. Laboratory studies and objective tests cannot detect the presence of fibromyalgia or measure the impairments it entails. Therefore, even if an ERISA administrator may sometimes impose a requirement for "objective" medical evidence that does not appear explicitly in a plan's terms, it would be unreasonable to do so here. *See Dinote v. United of Omaha Life Ins. Co.*, 331 F.Supp.2d 341, 348 (E.D.Pa. 2004) (finding administrator with discretionary authority could require objective evidence of disability). Such a requirement would effectively preclude any fibromyalgia patient from qualifying as totally disabled on the basis of the disease. The Third Circuit has found it arbitrary and capricious—not merely misguided—to require objective evidence of diseases for which such evidence is simply unavailable. *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 442–43 (3d Cir.1997) (reversing administrator's denial of disability benefits to chronic fatigue patient as arbitrary and

10. The SSA did not find Ms. Brown totally disabled before March 7, 2000. However, this is less significant than the finding of disability after that date, because the SSA standard for disability is more stringent than that applicable under the LTD policy. The SSA defines disability as "the inability to engage in *any substantial gainful activity* by reason of an impairment expected either to result in death or last for a continuous period of at least 12 months." Joint Ex. 9, at 5

(emphasis added). This definition does not require that a claimant actually be suitable for employment in a field, but only that opportunities for such employment exist in significant numbers in the national economy. *See* Joint Ex. 9, at 6. The LTD policy, however, only requires that Ms. Brown be unable to engage in "any occupation for which [s]he is or becomes qualified by education, training or experience." Joint Ex. 3, at 3.

capricious). Because fibromyalgia is such a disease, such a requirement would merit reversal here even if CNA's administrative decisions were entitled to deference. However, as explained above, in the case at bar CNA's administrative decision-making is not entitled to deference, and there is no sound reason for including a requirement of unobtainable objective medical evidence in this court's evaluation of Ms. Brown's disability.[11]

■ I find that Ms. Brown has been unable to work in "any occupation for which [s]he is ... qualified by education, training or experience" at least since June 1, 1999, when CNA terminated her LTD benefits. Accordingly, I conclude that she is disabled under the terms of the LTD policy and entitled to receive disability benefits from CNA. Under ERISA § 502(a)(1)(B), Ms. Brown may recover the monthly disability benefits she has not received since CNA terminated her benefits. From June 1, 1999, the date of termination, through August 31, 2000, this amount was $1,389.45 per month, or $20,841.75. However, since September 2000, Ms. Brown has received a monthly disability benefit from the Social Security Administration. From September 2000 forward, CNA must pay Ms. Brown only the difference between this Social Security payment and the CNA benefit otherwise owed to her, which comes to $380.45 per month. Thus, Ms. Brown's total damages through September 30, 2004, are $39,483.80.

Ms. Brown also seeks attorney's fees and prejudgment interest on her back benefits. I will consider these matters further on submission of a detailed petition setting forth the reasons justifying such an award and a calculation of the specific amounts sought.

**Conclusion**

For the foregoing reasons, the order accompanying this opinion provides for the entry of judgment in favor of Ms. Brown in the amount of $39,483.80 and the reinstatement of Ms. Brown's monthly LTD benefits, subject to the terms and conditions of the LTD policy.

**ORDER**

For the reasons stated in the accompanying opinion, it is hereby ORDERED that:

(1) Judgment is entered in favor of plaintiff Sharon Taylor Brown and against defendant Continental Casualty Company in the amount of $39,483.80, for disability benefits due to plaintiff through September 30, 2004.

(2) Defendant shall reinstate plaintiff's long-term disability benefits as of October 1, 2004, subject to the terms and conditions of the disability insurance policy.

(3) Plaintiff shall have 30 days from the date of this order to file a petition

---

**11.** Although the parties continue to debate the purported "objective evidence" requirement, the final administrative decision itself does not appear to rest ultimately on the evidence's lack of objectivity. In the final rejection of Ms. Brown's appeal, CNA does not appear to dispute that a diagnosis of fibromyalgia does not require objective findings to be legitimate. Rather, CNA seems to claim that Ms. Brown has failed to provide sufficient *detail* of her fibromyalgia's effects on her capacity to work: "evidence of [her] loss of functionality." Joint Ex. 5, at 19. While such a desire for details may be more reasonable than insistence on "objective" proof of fibromyalgia, it is equally irrelevant to this court's *de novo* review.

for prejudgment interest, and for attorney's fees and costs.